Bentley F. **BADGETT** and Imogene Badgett, Plaintiffs,

v.

**UNITED STATES** of America, Defendant.

Civ. A. No. 751.

United States District Court
W. D. Kentucky,
Owensboro Division.

Jan. 30, 1959.

**122**

W. Stuart McCloy, McCloy, Myar & Wellford, Memphis, Tenn., James A. Moore, Pepper, Bodine, Frick, Scheetz & Hamilton, Philadelphia, Pa., Neville Moore, Moore & Morrow, Madisonville, Ky., for plaintiffs.

J. Leonard Walker, U. S. Atty., Louisville, Ky., for defendant.

BROOKS, District Judge.

This is an action for the recovery of income taxes which taxpayers allege were erroneously assessed and collected.

The basic issue to be decided is whether or not under the facts of this case there was an exchange of property of a like kind to be held either for productive use in trade or business or for investment so that the exchange falls within the nonrecognition of taxability provisions of Section 112(b)(1) of the Internal Revenue Code of 1939, 26 U.S.C.A. § 112(b)(1).

The determinative facts are not disputed. Prior to July, 1953, the Badgett Mine Stripping Corporation, a family owned corporation, was the owner of a mining lease from West Kentucky Coal Company (hereinafter referred to as West Kentucky) and was engaged in the mining of coal by the strip method on the leased properties. The properties under lease are generally referred to as the Hecla Hill, Morton's Gap and Barnsley Hill areas, and the principal operation of the corporation was confined to Hecla Hill. This operation did not prove profitable in early 1953, and for this and other reasons, the corporation decided to discontinue its mining operations. However, certain stockholders and officers of the corporation, including the plaintiff, Bentley F. Badgett, desiring to continue the mining activities of the corporation, on July 7, 1953, formed a partnership, now known as the Badgett Mine Stripping Company (hereinafter referred to as Badgett), and paid the corporation $10,000 for its lease with West Kentucky. The partnership at the same time leased the coal mining equipment that the corporation had employed in its operations.

Shortly after the formation of the partnership, in August of 1953 the partners began negotiations with Homestead Coal Company (hereinafter referred to as Homestead) which company had expressed an interest in acquiring the right to strip mine the Barnsley Hill and Morton's Gap properties. Homestead at this time was strip mining other properties of West Kentucky which it had under lease that were located in close proximity to the tracts covered by the Badgett lease. Its tipple was favorably located and the acquisition of these additional areas would prolong its operations. Homestead, however, was not interested in an assignment of the Badgett lease, as it contained a thirty-day cancellation clause; did not provide for equalization of running time, although West Kentucky was its exclusive sales agent; and because the lease carried a high royalty payment. These negotiations between Badgett and Homestead resulted in an

agreement dated October 5, 1953, providing in part as follows:

"Whereas Badgett hereby undertakes and agrees to secure the cancellation and termination of the said leases from West Kentucky Coal Company, and further agrees and undertakes to cause West Kentucky Coal Company to execute and deliver to Homestead, either (i) a lease or leases upon said lands, or (ii) to amend the lease from West Kentucky Coal Company to Homestead on other lands so as to include the lands described in Exhibits A and B, which said new lease or amendments of the existing lease shall be upon terms and conditions acceptable to Homestead:

"Now Therefore, in consideration of the performance by Badgett of its undertakings and agreements above set out, Homestead hereby does covenant and agree to pay to Badgett an overriding royalty of twenty (20¢) cents on each ton of 2,000 pounds of No. 9, No. 11 and No. 12 coal mined and marketed by Homestead or its successors in title from the lands described in Exhibits A and B."

On the same date, October 5, 1953, an agreement was also entered into between Badgett and Sentry Royalty Company (hereinafter referred to as Sentry) whereby Sentry was given an option to purchase for $251,069.55 the overriding royalty agreement which Homestead had contracted to give to Badgett in consideration of Badgett's performing the conditions specified in its contract with Homestead. This option could not be exercised until April of 1954 and was in fact exercised on April 6, 1954.

On October 27, 1953, Badgett successfully concluded negotiations with West Kentucky. It cancelled its lease for the Barnsley Hill and Morton's Gap areas and West Kentucky included these areas in the lease that already existed between West Kentucky and Homestead. There are two contracts evidencing these transactions. The agreement between Badgett and West Kentucky cancelling the lease of the Barnsley Hill and Morton's Gap areas provided in part as follows:

"Whereas the parties had mutually agreed to cancel and terminate and remove from said Lease Agreement of November 16, 1951, the area embraced in the '2nd' paragraph on 'page 2' of said lease agreement, and further, to cancel and terminate in part said Amendment of January 30, 1953, leaving in effect, however, said lease of November 16, 1951, in all other particulars as same affects the areas left remaining in and embraced thereby and those areas left remaining in said Amendment of January 30, 1953, as hereinbelow identified.

"Now Therefore, for and in consideration of the premises, the parties hereto do hereby cancel and hold for naught said '2nd' paragraph appearing on 'page 2' of said lease dated November 16, 1951, and said Amendment of January 30, 1953 * * * and the Lessees do hereby agree to surrender and deliver up said demise premises therein included as above identified and to pay all rents and royalties pertaining to same due to this date, and the Lessor agrees to accept said payment and surrender in full satisfaction and discharge all of the Lessees' obligations in, by and under said documents pertaining to said areas, provided, however, that the Lessor does not by the acceptance of said surrender of said premises, release the Lessees from their responsibilities and obligations for any damage arising to the property of the lessor, or the property of others, resulting from overflow, copperas water, spoiled drainage or disposal to the date hereof;"

The second agreement executed on the same date between Homestead and West Kentucky amending the existing lease between Homestead and West Kentucky so as to include the Barnsley Hill and Mor-

ton's Gap areas provided in part as follows:

"Whereas, the parties hereto desire to further amend said 'Lease of Coal Lands Agreement' of October 28, 1943, and said 'Supplemental Agreement' of May 1, 1944, and said 'Amendment' of January 21, 1953, so as to include therein and add thereto certain additional areas embracing the No. 11 and No. 12 seams of coal for mining thereunder by the strip or open pit method of mining, which said area is referred to for the purpose of identification as the 'Barnsley Area;'

"Now Therefore, it is agreed and understood by these parties hereto that there shall be included in the area from which Homestead shall and herein is permitted to mine and remove coal available for stripping under the terms and conditions specified in said Agreement above referred to, the No. 11 and No. 12 seams of coal in, to and under the following described tracts or parcels of land, to-wit:"

Badgett having successfully completed its undertaking to have these properties become a part of the Homestead lease therefore on October 27, 1953, became entitled to the overriding royalty which it had optioned to Sentry for $251,069.55. On April 6, 1954, this option was exercised and Sentry made a payment on that date to Badgett of $72,810.18. The balance of the option price was paid in two installments; $77,831.56 on January 2, 1955, and the balance of $100,427.82 on September 1, 1955.

For income tax purposes the partnership reported these transactions as a sale of the lease of the Barnsley Hill and Morton's Gap areas and treated it as a long-term capital gain paid on the installment basis. The Commissioner held that the transfer of the lease in 1953 from Badgett Mine Stripping Corporation to the partnership resulted in a distribution of dividends to the stockholders and additional compensation to the employees to the extent of the fair market value of the lease. The Commissioner determined the fair market value of the lease to be $251,069.55, which was the amount received by the partnership for the overriding royalty agreement.

This case was prepared and tried before a jury with parties proceeding on the theory that the decisive factual issue was the value of the lease at the time it was purchased from the corporation by the partnership for $10,000. Early during the course of the proceedings, however, it was conclusively shown by the plaintiffs' expert witnesses that the lease transferred by the corporation to the partnership had no value in excess of the $10,000 paid for it. In fact, it was developed that no experienced operator would purchase the Badgett lease or any other coal mining lease containing a thirty-day cancellation clause. The Badgett lease was also of little value as it bore a flat 15 percent royalty payment which was exorbitant in comparison to similar agreements and did not provide for equalization of running time. It being determined that the lease had no value in excess of $10,000 the trial continued on the issue of the fair market value of the overriding royalty agreement when it was received and whether it was given to Badgett in consideration for the surrender of its lease or for personal services for causing West Kentucky to include the Barnsley Hill and Morton's Gap areas in the Homestead lease or both.

At the conclusion of the trial the following interrogatories were submitted to the jury with the resultant findings:

"Interrogatories

"1. What was the fair market value on October 27, 1953, of the overriding royalty agreement between Homestead Coal Company and Badgett Mine Stripping Company (Exhibit 9)?

"Answer: $190,000

"2. (a) Was the overriding royalty agreement (Exhibit 9) running from Homestead Coal Company to Badgett Mine Stripping Company

made by Homestead Coal Company in consideration of the cancellation of the leases (Exhibits 1 and 3) owned by Badgett Mine Stripping Company, or

"(b) Was it compensation for the services of Badgett Mine Stripping Company in negotiating with West Kentucky Coal Company on behalf of Homestead Coal Company, or

"(c) Was it partly for (a) and partly for (b)?

"Your answer will be (a) or (b) or (c).

"Answer: (c)

"(d) If your answer is that it was partly for each, what percentage of the value of said overriding royalty agreement should be apportioned to the cancellation of the lease and what percentage to compensation for Badgett Mine Stripping Company's services?

"Answer: *50%* percentage for cancellation of the lease

"*50%* percentage for Badget Mine Stripping Company's services."

It is now the basic contention of the taxpayers that these transactions resulted in an exchange of a leasehold interest for an overriding royalty agreement and constituted a tax-free exchange of property of like kind. It is the principal contention of the Government that the value of the overriding royalty agreement was a payment for personal services rendered by Badgett and is ordinary income to the partnership and not a transaction falling within the nonrecognition provisions of Section 112(b)(1) of the Internal Revenue Code of 1939.

Sections 112(a) and (b)(1) of the Internal Reveue Code of 1939 provide as follows:

"§ *112. Recognition of gain or loss*—

"(a) *General rule.* Upon the sale or exchange of property the entire amount of the gain or loss, determined under section 111, shall be recognized, except as hereinafter provided in this section.

"(b) *Exchanges solely in kind*— (1) *Property held for productive use or investment.* No gain or loss shall be recognized if property held for productive use in trade or business or for investment (not including stock in trade or other property held primarily for sale, nor stocks, bonds, notes, choses in action, certificates of trust or beneficial interest, or other securities or evidences of indebtedness or interest) is exchanged solely for property of a like kind to be held either for productive use in trade or business or for investment."

From these statutes it is apparent that under the general rule set forth in Section 112(a) the entire amount of gain or loss realized upon the sale or exchange of property is recognized and is taxable when realized unless it falls within the nonrecognition provisions of Section 112(b) (1). Therefore to sustain their position the taxpayers must establish that the Badgett lease was (a) exchanged solely for the overriding royalty agreement (b) that the overriding royalty agreement is property of a like kind and (c) that the overriding royalty agreement was to be held by Badgett either for productive use in trade or business or for investment and not primarily for sale. Failure of the taxpayers to place themselves within these three essential requisites of the statute or either of them is to lose the benefit of the exception to the general rule and the gain from the transaction in question must be recognized and taxed when it was realized. The exceptions to the general rule are strictly construed, Midfield Oil Company v. Commissioner, 39 B.T.A. 1154; Connecticut Power Company v. Commissioner, 28 B.T.A. 38, and the burden is on the taxpayer to place himself within the exceptions. United States v. Anderson, 269 U.S. 422, 46 S.Ct. 131, 70 L.Ed. 347; United States v. Mitchell, 271 U.S. 9, 46 S.Ct. 418, 70 L.Ed. 799; Doll v. Glenn, 6 Cir., 231 F.2d 186.

It is first considered if there was in fact an "exchange" of the Badgett lease for the overriding royalty agree-

ment. The word "exchange" is to be given its ordinary meaning. It is a word of precise import meaning the giving of one thing for another, requiring the transfers to be in kind and excluding transactions into which money enters either as a consideration or as a basis of measure. Trenton Cotton Oil Company v. Commissioner, 6 Cir., 147 F.2d 33. An "exchange" is a reciprocal transfer of property as distinguished from the transfer of property for a money consideration only. Treasury Regulations 118, Section 39.112(a)–1, (e), promulgated under the Internal Revenue Code of 1939.

■ The surrender of a portion of the Badgett lease covering the Barnsley Hill and Morton's Gap areas to West Kentucky and the subsequent inclusion by West Kentucky of these two tracts in a pre-existing lease between West Kentucky and Homestead and upon substantially different terms does not meet these quoted definitions of "exchange". Clearly upon the surrender and cancellation of that part of the Badgett lease that covered the Barnsley Hill and Morton's Gap areas, Badgett was left with nothing to part with in "exchange" for the overriding royalty agreement it received from Homestead. The only interest of Homestead was to acquire the two areas that were included in the Badgett lease, but the lease itself, because of its terms, was entirely unacceptable. As stated in the contract between Badgett and Homestead dated October 5, 1953, it was necessary for Badgett to "cause" West Kentucky to lease these two areas to Homestead upon terms and conditions acceptable to Homestead. The accomplishment of this undertaking was the consideration for the overriding royalty agreement which the jury valued at $190,000. Such a transaction is not a "reciprocal transfer of property" or a "transfer in kind".

Since it is decided that there was not an "exchange" of a portion of the Badgett lease for the overriding royalty agreement, it is not necessary to consider whether (b) that the overriding royalty agreement is property of a like kind and (c) that the overriding royalty agree-

ment was to be held by Badgett either for productive use in trade or business or for investment and not primarily for sale. However, it should be mentioned that there is considerable doubt that the Badgett lease and the overriding royalty agreement are like property in view of the recent case of Commissioner of Internal Revenue v. P. G. Lake, Inc., 356 U.S. 260, 78 S.Ct. 691, 2 L.Ed.2d 743. There is even more serious doubt as to whether the overriding royalty agreement was to be held by Badgett either for productive use in trade or business or for investment. On the same day the overriding royalty agreement was executed it was offered for sale and optioned to Sentry. The partners in negotiating with Homestead were primarily interested in selling the mining equipment that the partnership had leased to conduct its operations, and they were successful in disposing of most of it to Homestead. As testified by an official of Homestead, one of the reasons for purchasing the equipment and taking over the Barnsley Hill and Morton's Gap areas was to eliminate Badgett as a competitor. These facts give rise to a strong inference that Badgett was holding the overriding royalty agreement primarily for sale and not for productive use in trade or business or for investment. See Foran v. Commissioner, 5 Cir., 165 F.2d 705; Regals Realty Company v. Commissioner, 43 B.T.A. 194, affirmed 2 Cir., 127 F.2d 931; Fidelity-Philadelphia Trust Company, Executor v. Commissioner, 23 B.T.A. 620, 624.

■ The conclusion that the taxpayers have failed to bring themselves within the exception to the general rule by failing to make an "exchange" such as recognized by Section 112(b)(1) is further supported when it is considered whether the transaction in question comes within the plain intent of the statute. Such an inquiry is proper. Gregory v. Helvering, 293 U.S. 465, 55 S.Ct. 266, 79 L.Ed. 596. And as stated in Treasury Regulations 118, Section 39.112(a)–1, (d), "nonrecognition is accorded by the Internal Revenue Code only if the ex-

change is one which satisfies both (1) the specific description in the Code of an excepted exchange and (2) the underlying purpose for which such exchange is excepted from the general rule." The underlying assumption of these exceptions is that the new property is substantially a continuation of the old investment still unliquidated. Treasury Regulations 118, Section 39.112(a)–1, (b). Differently stated the purpose of Section 112(b) (1) was to limit the recognition of gain or loss in connection with exchanges of property from which the taxpayer realized no actual gain or loss according to the layman's understanding of the term. Volume 3, Merten's Law of Federal Income Taxation, Section 20.22 and see Trenton Cotton Oil Company v. Commissioner, supra, citing Portland Oil Company v. Commissioner, 1 Cir., 109 F.2d 479.

Again a consideration of the surrounding facts and circumstances of the transaction in question discloses that the overriding royalty agreement is not substantially a continuation of the old investment (that portion of the Badgett lease surrendered to West Kentucky) still unliquidated nor is the transaction in question an exchange of property from which the taxpayers realized no actual gain according to the layman's understanding of the term. The Badgett lease was purchased for $10,000. It was not assigned or transferred to Homestead because it was of no value to Homestead. As a result of negotiations between Badgett and West Kentucky a portion of the lease covering the Barnsley Hill and Morton's Gap areas was cancelled. These two tracts were then added by amendment to the lease already existing between West Kentucky and Homestead and upon terms substantially different than contained in the Badgett lease. By this amendment a new property right was created between Homestead and West Kentucky entirely different from that theretofore existing between Badgett and West Kentucky. It

was for the new property right it caused to be created and not for the lease it surrendered that Badgett received the overriding royalty agreement which it later sold for $251,069.55 and which the jury valued at $190,000 as of the day it was realized.

The second interrogatory submitted to the jury sought to have determined the question of whether the overriding royalty agreement was given in consideration of the cancellation of the Badgett lease or for compensation for negotiating the amendment to the Homestead lease or for both. The jury allocated $95,000 to the cancellation of a portion of the Badgett lease and $95,000 for the services of Badgett in negotiating the amendment to the Homestead lease. These findings are not supported by the evidence and must be set aside. The Court found that as a matter of law the value of the entire leasehold was not more than $10,000 at the time is was purchased by the partnership, which was the price paid for it. There was no attempt made to introduce any evidence to show the value of that portion of the lease that was surrendered at the time it was cancelled. A jury verdict cannot be based upon surmise or speculation. Pennsylvania Railroad Company v. Chamberlain, 288 U.S. 333, 344, 53 S.Ct. 391, 77 L.Ed. 819. The burden being upon the taxpayers, and they having failed to sustain it, it follows that the overriding royalty agreement was given to Badgett in consideration of Badgett's "causing" West Kentucky to include the two areas in the Homestead lease on terms acceptable to Homestead, and the value of the overriding royalty agreement was ordinary income to Badgett for the services it rendered.

Counsel for the Government will tender findings of fact and conclusions of law supplementing those contained in this memorandum and will submit appropriate order and judgment.