(No. 38942.—

THE PEOPLE *ex rel.* Bernard J. Korzen, County Collector, Appellee, *vs.* CHICAGO, BURLINGTON & QUINCY RAIL-ROAD CO., Appellant.

*Opinion filed May 20, 1965.*

HOLT AND KEARNEY, and JOHN H. BISHOP, both of Chicago, (ELDON MARTIN, C. W. KROHL, MARSHALL V. KEARNEY, MARK M. MOONEY, ROBERT J. NOLAN, R. T. CUBBAGE, and T. G. SCHUSTER, of counsel,) for appellant.

DANIEL P. WARD, State's Attorney, of Chicago, (EDWARD J. HLADIS, THEODORE M. SWAIN, and THOMAS A. HETT, Assistant State's Attorneys, of counsel,) for appellee.

AUSTIN L. WYMAN, of Chicago, for *amici curiae* Illinois Municipal League and Illinois Association of School Boards.

Mr. JUSTICE HOUSE delivered the opinion of the court:

The Chicago, Burlington & Quincy Railroad (Burlington) filed an objection to an application by the county collector of Cook County for judgment for taxes paid under protest by it for the year 1957. The trial court found that locally assessed property in Cook County was assessed at a level no higher than 50% of its fair cash (full) value, that the Department of Revenue did not assess the railroad property at full value, that the objector failed to prove discrimination and constructive fraud and denied the objection. The railroad appeals directly to this court since the cause relates to the revenue.

No appeal was taken from the portion of the order finding undervaluation of locally assessed property so that the

sole issue before us is whether the proof overcomes the presumption that the Department of Revenue complied with the statute and assessed the railroad's property at full value. In this respect the case at bar is similar to the cases of *People ex rel. Musso* v. *Chicago, Burlington and Quincy Railroad Co.* Nos. 38859-38904 consolidated, (33 Ill.2d 88) but the approach is entirely different. In *Musso* evidence was offered in support of the theory that the assessed value of railroad property was debased to contain the spread between it and locally assessed property, while here the collector's theory is that the evidence of sales of other railroads between 1947 and 1961 demonstrates that the assessments made by the Department of Revenue were far lower than full value and that there is no evidence to sustain full value of the railroad's property.

It is now settled that where a railroad's assessment is at full value and locally assessed property is so undervalued as to result in gross discrimination against the railroad, the assessment is constructively fraudulent. (*People ex rel. Kohorst* v. *Gulf, Mobile and Ohio Railroad Co.*, 22 Ill.2d 104; *People ex rel. Hillison* v. *Chicago, Burlington and Quincy Railroad Co.*, 22 Ill.2d 88; *People ex rel. Dallas* v. *Chicago, Burlington and Quincy Railroad Co.*, 26 Ill.2d 287; *People ex rel. Wenzel* v. *Chicago and North Western Railway Co.* 28 Ill.2d 205; *People ex rel. Enrietta* v. *Gulf, Mobile and Ohio Railroad Co.* 29 Ill.2d 605.) As stated in *Hillison* and *Kohorst,* the measure of recovery in such case is the difference between the amount of taxes extended against a railroad and the amount which would have been extended had the locally assessed property (at the county level) been equalized at full value.

The only testimony offered by the collector was. that of two witnesses who prepared graphs and identified exhibits and that of Harry F. Hulman, Director of Revenue, who defined salvage value and answered several hypothetical questions on cross-examination. The Collector introduced

in evidence all of the Department of Revenue's data sheets for all Illinois assessed railroads for each year from 1951 to 1960. From the data sheets the straight average (the average without application of a judgment factor) of capitalized earnings, stock, debt and reproduction cost was computed and the percentage of assessed value to that average was obtained. Graphs were then prepared from the results obtained and are in evidence.

The Collector also introduced certified copies of Interstate Commerce Commission reports concerning sales and acquisitions of railroads from which various data were taken and introduced in the form of exhibits, including charts, analyzation of the reports, and the Collector's deductions therefrom as to the market value of the operating property of those roads. A summary chart shows the so-called "allocated market value" from the deductions, the amount of the assessment and the "assessment ratio" which is the percentage which assessed valuation bears to such allocated market value. The assessment ratio thus obtained varied from slightly over 50% to about 87%.

Briefly, the exhibits introduced by the Collector with respect to the 12 railroad transactions (which will be numbered consecutively for ready reference) reveal the following:

1. The Calumet Western Railway was wholly owned by three corporations. In 1959 the Pennsylvania Railroad purchased the 25% block of Calumet's stock from its subsidiary, Pennsylvania Company, at a contract price of $108,000 which was the cost of the stock to the seller's corporate predecessor, there being no known market value. A value of $432,000 was then allocated to all of the capital stock by multiplying the 25% value by four. The assessed value for the year 1959 was $330,000.

2. The St. Louis & Ohio River Railroad with 18.42 Illinois miles leased its property to the Alton & Southern Railroad. Both were wholly owned subsidiaries of Alumi-

num Corporation of America. The operating property was transferred to the Alton & Southern for $1,165,450 while the assessed value was $432,000.

3. The Baltimore & Ohio Chicago Terminal Railroad Co. was wholly owned by Baltimore & Ohio Railroad Company and in addition the B. & O. owned $32,000,000 in first mortgage 4% bonds. The B. & O. was paying 5% and 6% on its own bonds, so it refinanced by selling the B. & O. C. T. bonds, and selling the stock for $2,500,000 with the option of an early repurchase. The value used was $26,886,579 while the assessed value was $20,200,000.

4. The Belt Railway Company of Chicago with 376.30 track miles was owned by 12 railroads and used by them for switching over facilities of Chicago & Western Railroad, which the Belt had under a lease with an option to purchase. The option price fixed in 1912, with adjustments, was used and amounted to $35,096,271 in 1961 while the assessed value was $21,950,000.

5. The Peabody Short Line (11 track miles) was sold in 1955 to a subsidiary of Peabody Coal Corporation for $1,650,000 and resold by it in 1960 to Illinois Central Railroad Company for $2,265,995, while the assessed value for those years was $1,325,000 and $1,425,000 respectively.

6. The Chicago River & Indiana Railroad leased 139 miles of trackage from Chicago Junction Railway in 1922 and purchased the leased road and properties of two other interlocking corporations with first mortgage bonds. The net sale price attributed by the Collector to this transaction was $22,700,000 and the assessment was $19,700,000.

7. In 1953 the St. Louis & O'Fallon Railway was granted permission by the Interstate Commerce Commission to abandon operations and the Commission fixed the scrap or salvage value at $210,000. The Department then assessed the property at that figure. Thereafter, it was leased by Chicago & Eastern Illinois for a period of 10 years with quarterly rental of $7,124.04 or a total of $285,001.60 with the

option to purchase for $1.00 at the end of the term if not in default.

8. In 1957 the Chicago & North Western Railway Company purchased 87.6% of the shares of Litchfield & Madison Railway Company for $44.444 per share from 13 owners and offered a similar price to remaining owners. After acquisition of all stock it was merged into the North Western's system. The latter used the 56.50 miles of L. & M. road as an extension of its line to provide entry to the St. Louis area. It had accumulated operating losses which could be used as tax loss carryovers, and by purchasing the L. & M. could recoup income taxes. The net sale price was $9,320,413 and the assessed valuation was $4,800,000.

9. The Toledo, Peoria & Western Railroad in 1954 had 90,000 shares outstanding, 82% of which was held by a trust. Three years before one road offered $69.50 per share, later raised to $80. In 1955 the Santa Fe and Pennsylvania became interested and got a commitment for 26% of the shares in the trustee block for $100 per share. Thereafter the Santa Fe bid and purchased that block and the remaining outstanding shares for $135 per share after the original offeror increased its bid to $133 per share. The net sale price finally amounted to $12,143,988 and the assessed value was $8,100,000.

10. The Jefferson Southwestern Railroad was sold in 1952, there being some difference in the exhibits as to actual sale price. Its 13.73 miles of road was sold for approximately $85,000, the same amount as the assessment for that year. Such assessment was $50,000 in 1953.

11. The transaction concerning Chicago, North Shore & Milwaukee Railway, an electrically operated road, involved cessation of operation and salvage value. In 1955 it abandoned 19.25% of its Illinois property and in 1960 the remainder. The scrap values were estimated by an officer of the parent company at $653,709 and approximately $4,000,-

ooo respectively, while the assessed values were $423,500 and $2,100,000 respectively.

12. The Chicago, Aurora & Elgin Railway, another electric road, was abandoned in 1961 and its "allocated value" of $3,200,000 was obtained from the Department's data sheet which stated that L. S. O'Malley, president of C.A. & E., had testified before the Commission that such a value was the scrap value. Assessed value for 1961 was $850,000.

The objector strenuously questions the admissibility of the 12 railroad transactions either as a sales-ratio study to establish a level of assessment of railroad property, or to establish comparability with the Burlington. Without waiving its objection to this type of evidence, the objector introduced evidence with respect to the remaining 6 railroad transactions which were not used by the Collector.

The Baltimore & Ohio was acquired by the Chesapeake & Ohio in 1962. The latter owned 19% of the stock, purchased enough in the open market to bring its holdings to 40% or 45% and additionally exchanged shares to make its holdings about 90%. The objector based its cost of acquisition upon the market value as of the date of transfer and used the debt figure from the Department's data sheet. The assessed value was 102% of the value thus obtained. The Collector argues that if the debt figure is taken from the balance sheet attached to the Commission's report the percentage to value would only be about 85. The Minneapolis & St. Louis was sold to the North Western. The debt from the data sheet was added to the sale price which resulted in a relationship of 99%. The Collector here also argues that use of the Commission's balance sheet figure would decrease the relationship to 93+%. The Indiana Harbor Belt Railroad transaction was an intercarrier transaction which objector says is 117% of assessment to sale price, while the Collector says current liabilities were ignored in the data sheet and that the relationship should be

82+%. The Illinois Northern Railway was involved in a multiple-carrier transaction and objector contends the relationship of sales price to assessment is 117%. The Collector argues the influence of tie-in with other sales and leases on the sales price cannot be accurately determined. The Illinois Terminal Railroad property was purchased by a new corporation owned by 10 carriers. It is contended by the respective parties that the relation of sale price to assessment ($17,500,000) was 95% and 80+% respectively.

Lastly, and probably the most revealing since the Burlington is directly involved, is the consolidation of the Burlington, Northern Pacific and Great Northern railroads in 1961. The latter two roads each owned 48½% of Burlington's stock and 3% was owned by the public. After long negotiation an agreement was entered into by which the properties of the 3 roads would be merged into a new company. Burlington stockholders were to each receive 3¼ shares of stock in the new corporation for each share of Burlington common while Great Northern stockholders were to receive one for one. Since Burlington stock was unlisted, the objector computed the value by multiplying the market value of Northern Pacific stock on the date of the agreement by the 3¼ ratio times the number of Burlington shares and thus obtained the merger value of the Burlington properties. The resultant Illinois portion of the Burlington merger value was $120,761,956 while the assessment for the year in question was $140,450,000 or a relationship of 116%.

Assuming, *arguendo*, that the data taken from Interstate Commerce Commission reports is admissible for any purpose, it cannot be used as an assessment ratio study, as is done with locally assessed property. The purpose of such a study is to establish a level of assessment, not the ratio of particular property not sold. It is a statistical technique of so sampling sales that a series of eligible transactions can provide a frequency distribution pattern which will provide

a median representative of the level of assessment of a given class of property. Some of the principal tests which must be met, according to the experts, are grading property into comparable classes, sufficient transactions to produce a weighted average that will reflect accuracy, sales must be at arms length, condemnation sales are eliminated and intercorporate transfers are left out. None of the transactions meet all of these tests. The question then presents itself as to whether the Collector's 12 transactions are admissible to prove comparability of the properties there involved with the property of the objector.

In order to qualify the 12 transactions introduced by the Collector to show that the Burlington assessment was not at full value, a foundation must first be laid to prove comparability. The burden of showing comparability is on the party sponsoring the comparison sales. (*People ex rel. Paschen* v. *Hendrickson Pontiac, Inc.,* 12 Ill.2d 477.) A resumé of the transactions, to which reference will be made by number, capsules the kind of proof tendered to meet this burden.

Transactions 1, 2, 3, 4, 6 and 7 are intercorporate transactions between parent and subsidiary or subsidiary and subsidiary. Additionally, transactions 2, 4 and 7 involve leaseholds. Transaction 5 not only involved a purchase by the Illinois Central of all of the stock of the 11 miles of Peabody Coal Short Line, but the Illinois Central contemporaneously was to purchase directly Peabody's coal company spur tracks and rail barge loading facilities. Transaction 6 was also tied in with the transfer of some industrial land.

Transaction 8 was unique in that it furnished entry to an industrial area by the purchaser and gave it the advantage of a tax loss carryover. Transaction 9 was the sale of stock which resulted after a bidding contest which started at $69.50 per share and ended at $135 per share. It shared the distinction of being one of two interstate roads involved

in the 12 transactions (the other being the defunct North Shore involved in transaction 11) and operated interstate only by virtue of the fact that it was a bridge carrier across the river to Keokuk, Iowa. Transactions 11 and 12 both involved suburban passenger railroad lines with salvage value only, most of which was urban real estate.

Further comparisons with the railroads involved in the 12 transactions show that the Burlington has 8,046 system miles, while 4 of the 12 roads have less than 12 miles and 2 others have 100 or less miles each. The Burlington operates freight, passenger and commuter trains in 8 States while some of the 12 roads were passenger or freight lines only.

From the foregoing analysis, and considering the whole record, we are definitely of the opinion that these transactions do not establish comparability, and the Collector has failed to support his burden of establishing the admissibility of the transactions for that purpose.

In addition to the documentary evidence, the objector offered the evidence deposition of Raymond S. Danis, former Supervisor of Railroad Assessment, and Railroad Assessment Supervisor from 1948 to 1960, retired, who was not living at the time this case was heard. He prepared the data sheets upon which was computed a 5-year average of income capitalized at 6%, a 5-year average of market value of stock and debt less nonoperating properties, and the cost of reproduction depreciated of the Illinois property, as furnished by the Interstate Commerce Commission. The system factors of capital and market value were then allocated to Illinois and the Illinois costs of reproduction depreciated were added and the straight average of the three was determined. The straight average was not the assessment and neither was any of the three indicators considered alone. He used the average as a guide and applied his judgment to produce a recommended assessment value to the Director. His recommendations were usually

564

followed. In the event the carrier protested and asked for a hearing, he and the Director would hear the protest and come to a conclusion. He cited as an example the Burlington's 1957 assessment which he fixed at $147,100,000 and following a hearing the Director reduced it to $147,000,000. Danis unequivocally stated that the resultant final assessment was the full fair cash value or 100%, and that there was no attempt to equalize such assessments with locally assessed property.

At this point we think it appropriate to consider the Collector's attempt to impeach Danis by showing that his testimony in the Lee County *Hillison* case in 1960 was inconsistent with his evidence deposition given in this case in 1962 shortly before his death. His testimony in that case was introduced here. The Collector asserts that it indicated that another factor taken into consideration in arriving at the final assessment was a desire of the Department for continuity of assessments. Not a question was asked of the witness to lay a foundation for impeachment, and his death prevents an explanation. Under such circumstances the impeachment evidence is inadmissible. *Cf. People* v. *Moses,* 11 Ill.2d 84; *Ayers* v. *Watson,* 132 U.S. 394, 33 L.ed. 378, 10 S. Ct. 116.

This court has given specific approval to the factors used by the Department of Revenue to arrive at railroad valuations in *Hillison, Enrietta* and other cases. And where the Department assesses a railroad's operating property in accordance with the recognized and approved factors, it will be presumed to have been assessed at full value as required by statute. *People ex rel. Hillison* v. *Chicago, Burlington and Quincy Railroad Co.* 22 Ill.2d 88; *People ex rel. Kohorst* v. *Gulf, Mobile and Ohio Railroad Co.* 22 Ill.2d 104.

We are aware of the impact of an adverse holding on the interested taxing bodies but, as readily recognized by *amici curiae,* our decision cannot be based upon their financial needs. *Amici* argues "the great improbability of

accuracy here of presumptions traditionally indulged with respect to the acts of public officials and the contents of public records.". Nevertheless, such a presumption has an important role in our jurisprudence and cannot be ignored. Here, there is no competent evidence to overcome the presumption and, in fact, it is supported by Raymond L. Danis, an expert in this field, who prepared the assessment on behalf of the People through the Department of Revenue.

The judgment of the circuit court of Cook County is reversed, and the cause is remanded with directions to order a refund computed in accordance with the *Kohorst* and *Hillison* cases.

*Reversed and remanded,*
*with directions.*