417 P.2d 689

A. E. BADE, Pima County Assessor, Thomas Jay, Dennis Weaver and Peter Rubi, as members of and constituting the Board of Equalization and the Board of Supervisors of Pima County, Arizona, Carroll H. Christian, Pima County Treasurer, and William Stanford, Warren Peterson and Thad Moore, as members of and constituting the State Board of Equalization of Arizona, Appellants,

v.

Richard M. DRACHMAN, Fanchon Drachman and Campbell Plaza Co., a limited partnership, Appellees.*

No. 2 CA–CIV 260.

Court of Appeals of Arizona.

Aug. 17, 1966.

Supplemental Opinion on Denial of Rehearing Sept. 13, 1966.

Review Denied Sept. 30, 1966.

* This appeal was filed with the Arizona Supreme Court and assigned that Court's Number 8619. The matter was referred to this Court pursuant to Section 12-120.23 A.R.S.

William J. Schafer, III, Pima County Atty., Rose Silver, Chief Civil Deputy County Atty. for Pima County, Manuel Avalos, Deputy County Atty. for Pima County, Tucson, for appellants Bade and Christian.

Robert N. Hillock, Sp. Deputy County Atty., for Pima County, Tucson, for appellants Jay, Weaver and Rubi.

Darrell F. Smith, Atty. Gen., James D. Winter, Asst. Atty. Gen., Phoenix, for appellant, State Bd. of Equalization.

Boyle, Bilby, Thompson & Shoenhair, by Marvin S. Cohen, Tucson, for appellees.

Robert Corbin, Maricopa County Atty., Olgerd W. Kalyna, Sp. Deputy County Atty. for Maricopa County, Henry J. Florence, Deputy County Atty. for Maricopa County, Phoenix, for Maricopa County, as amicus curiae.

MOLLOY, Judge.

This appeal is taken from a judgment in the Superior Court of Pima County in favor of appellees (plaintiffs below) against ap-

pellants (defendants below). We shall refer to the parties as they appeared in the lower court. The factual posture of the case, as to which there is no dispute, is as follows.

Plaintiffs Drachman are the owners of commercial real property and the improvements thereon and plaintiff Campbell Plaza Co. is the lessee of this property. The improvements consist of a shopping center, constructed in 1960. In 1963, the Pima County Assessor assessed for tax purposes all and in Pima County not subject to assessment by the State Tax Commission at 12½ per cent of full cash value as determined by the Assessor while all realty improvements were assessed at 23 per cent of full cash value. The property which is the subject of this litigation was assessed for tax purposes in 1963 in accordance with these percentages. To determine the assessed value of improvements, the Assessor's method was to apply the percentage of 23 per cent to the actual cost of construction less a depreciation factor of 2 per cent per annum.

The complaint set forth two counts: Count I alleged that the intentional and systematic assessment for tax purposes of realty at 12½ per cent of full cash value and of improvements at 23 per cent of full cash value was illegal and violative of constitutional and legislative mandates, and that said assessment constituted legal fraud to the extent of 44.34 per cent thereof by virtue of application of a higher percentage. Count II alleged that the method used by the Assessor to determine full cash value of improvements was illegal in that construction costs less depreciation is not equivalent to full cash value as defined by applicable statutes and that this arbitrary method of determining value discriminated against plaintiffs' particular improvements.

The lower court granted plaintiffs' motion for summary judgment as to Count I. Count II was submitted to the court on the basis of testimony taken at a hearing on plaintiffs' application for a temporary injunction held on August 23, 1963. Final judgment on both counts was in favor of the plaintiffs, the court finding that the defendants had intentionally and systematically assessed property in Pima County by use of a discriminatory percentage of full cash value and that full cash value was determined by a systematic and intentional use of a discriminatory method of valuation (cost less depreciation). The trial court granted relief by enjoining the defendants from extending on either the 1963 tax roll or the 1963 assessment roll a valuation for the subject improvements in any amount greater than 12½ per cent of $700,000.00, which sum the trial court found to be the full cash value of said improvements, and from collecting taxes against said improvements based upon any assessment greater than 12½ per cent of $700,000.00. The defendant Carroll H. Christian, Pima County Treasurer, was further ordered to refund to the plaintiffs the sum of $5,220.40, which amount had been paid by the plaintiffs as taxes upon the subject improvements during the pendency of the action over and above the tax which would be due if the said improvements were assessed for the year in question at 12½ per cent of $700,000.00.[1]

There have been two opening briefs filed with this Court by the appellants which in toto postulate nine questions for decision on appeal. Several of these questions overlap while others are phrased in duplicitous manner. Accordingly, we think it best to state the questions raised as follows:

1. Under existing constitutional and statutory provisions is it lawful for a coun-

1. At the conclusion of the hearing upon plaintiffs' petition for a temporary injunction, the court granted the temporary injunction on Count I and denied the temporary injunction on Count II so that plaintiffs' property was carried forward on the tax rolls for the calendar year 1963 at a valuation of 12½ per cent of $1,000,661.00, the cost less depreciation figure used by the county assessor as the full cash value of the property. The plaintiffs paid the 1963 taxes on the basis of this assessment.

ty assessor to systematically and intentionally value one class of property for tax purposes at a certain percentage of its cash value and to value another class of property at a lower percentage?

2. Did the trial court err in granting injunctive relief for the reason that the taxpayer had an adequate remedy at law?

3. Did the trial court err in granting equitable relief in that such relief was in violation of A.R.S. § 42–204, either as it existed prior to March 26, 1964, or as amended effective after that date?[2]

4. Did the court err in requiring responsible officials to assess plaintiffs' property at a percentage (12½ per cent) of its full cash value?

5. Is it lawful for the county assessor to use the cost of improvements less depreciation as the full cash value thereof?

6. Did the trial court err in setting a specific value upon the subject improvements rather than remanding the problem to the county assessor with appropriate instructions?

**IS IT LAWFUL FOR THE ASSESSOR TO APPLY DIFFERENT PERCENTAGES TO THE VALUES OF DIFFERENT CLASSES OF PROPERTY?**

▉ Defendants contend that "from time immemorial" the Pima County Assessor, for ad valorem tax purposes, has taxed land value at "generally" 12½ per cent of full cash value and improvements on realty at "approximately" 23 per cent of such value.[3] There is no contention made that the percentages used in Pima County are the same as those used by other county assessors. The defendants contend that the court should not disturb long established administrative interpretations and practices. We do not believe that the existence of whatever long standing practices there may be as to these percentages ipso facto bars relief to a complaining taxpayer. In dealing with similar contentions, our Supreme Court in Southern Pacific Company v. Cochise County, 92 Ariz. 395, 377 P.2d 770 (1963) said:

"Although the light of a legitimate grant of power for administrative action is

2. "§ 42–204. Payment of tax as prerequisite to testing validity thereof; injunctive relief prohibited; refunds
"A. Any person upon whom a tax has been *imposed or levied under any law re*lating to taxation shall not be permitted to test the validity *or amount* thereof, either as plaintiff or defendant, unless the tax is first paid to the county treasurer authorized to collect the tax, together with all penalties thereon.
"B. No injunction shall issue in any action or proceeding in any court against the state *or an officer thereof*, or against any county, municipality or officer thereof, to prevent or enjoin *the extending upon the tax roll of any assessment made for tax purposes*, or the collection of any tax imposed or levied.
"C. After payment of the tax, an action may be maintained to recover any tax illegally collected, and if the tax due is determined to be less than the amount paid, the excess shall be refunded in the manner provided by this chapter."
(Emphasized portion was added by Chapter 40, § 1 of the Laws of 1964 effective March 26, 1964)

3. The quotes are from pages 8 and 9 of the opening brief of the county officials. We note that the author of a law review article appears to have been informed by the Pima County Assessor's office that in 1963 the percentages used were 15 per cent as to the value of land and 25 per cent as to the value of improvements. Fisher, "Standing of the Undervalued Property Owner", 5 Arizona Law Review, 94, 100. The only testimony in the record upon the consistency of these percentages was given by Pima County Assessor Jack Bade when he answered affirmatively to the following question:
"Would you reiterate Mr. Neal's (chief evaluation engineer for the Pima County Assessor who had previously testified) testimony that it has been the *consistent practice* in the County to value all unimproved real estate at 12½ per cent, and as the statute directs to separately assess the improvements on real property at a value of 23 or 23½ per cent?" (Emphasis added)
(Page 172 of the transcript.)

often quite dim, it may safely be said that a statute which gives unlimited regulatory power to a commission, board or agency with no prescribed restraint offends the Constitution as a delegation of legislative power. State v. Marana Plantations, [Inc.,] 75 Ariz. 111, 252 P.2d 87. What the legislature cannot do is to delegate to an administrative body or official not only the power to fix a rate of taxation according to a standard but also the power to prescribe the standard. Duhame v. State Tax Commission, 65 Ariz. 268, 179 P.2d 252, 171 A.L.R. 684. (92 Ariz. 404, 377 P.2d 777.)

\* \* \* \* \* \*

"We do not find here an ambiguity and cannot countenance the wilful, systematic and intentional violation of the law no matter how long continued. To do otherwise would be to deny the equal protection of the law to appellant." (82 Ariz. 406, 377 P.2d 778.)

We believe the Southern Pacific case, supra, disposes of this particular attack upon the judgment rendered below with the exception of the appellants' reliance upon A.R.S. § 42-136[4] which was added to our Code by Chapter 43 of the Laws of 1963, effective March 27, 1963 (after the rendition of the Southern Pacific decision). It is the contention of the appellants that the legislature by creating separate classes of property "for the purpose of determining the basis of valuation for assessments" has placed its stamp of approval upon the practice of county assessors in using different percentages for different classes of property. Appellants further argue that inasmuch as "improvements on commercial and industrial property" have been designated as a separate class of property, the plaintiffs may not complain that the county assessor has used a higher percentage for such improvements than that used for some other property.

We are unable to agree with the appellants. It is our opinion that if the legislature had intended to nullify the judicial pronouncements in the Southern Pacific case, it would have done so by repeal or amendment of the several existing statutes requiring assessment at full cash value. Southern Pacific held that there is a "general legislative scheme that assessments on all species of property shall be at full cash value." (92 Ariz. 401, 377 P.2d 774) Among the statutes pointed out in the Southern Pacific decision as clearly requiring that all property be assessed at "its full cash value" are A.R.S. §§ 42-123, 42-143, 42-147, 42-227 and 42-762. There are others.[5] We think it unlikely that the legislature intended by the enactment in question to nullify all of these statutes and to give blanket approval to various percentages applied by the county assessors of this state, whatever they might be. It is our opinion that A.R.S. § 42-136 was enacted to enable the Director of the State Division of Appraisal and Assessment Standards to gather information for the legislature in such manner as to enable the legislature to intelligently approach the task of establishing various percentages for various classes of property, should it decide to do

---

4. Pertinent portions of this statute read:
 "§ 42-136. Classification of property
 "On the effective date of this article, *for the purpose of determining the basis of valuation for assessments*, there are created the following classes of property:
 \* \* \* \* \*
 "14. Lands used for commercial and industrial purposes.
 \* \* \* \* \*
 "16. Improvements on commercial and industrial property" (Emphasis added.)

5. A.R.S. §§ 11-542, 42-221 and 42-238. A.R.S. § 11-542 requires the county assessor before entering upon the duties of his office to take and subscribe the following oath:
 "I do solemnly swear (or affirm) that I will well and truly discharge the duties of assessor of the county of \* \* \*, and will, to the best of my knowledge and ability, truly and fairly assess, without favor of partiality, all the taxable property of said county *at its full cash value*." (Emphasis supplied.)

so. Among the duties cast upon this new office created by Chapter 43 of the Laws of 1963, is:

"Ascertaining the percentage of full cash value at which the *various types of property* are assessed by the commission and by each of the county assessors * * *." (Emphasis added) A.R.S. § 42–135, subsec. A, par. 2

If it was the intent of the legislature, contrary to our interpretation, to give blanket approval to whatever the practices of the various county assessors might be in this regard, then we believe such a statute would violate constitutional prohibitions against delegation of legislative power, under the Southern Pacific case, supra.

█ We conclude that the practice of the county assessor in using different percentages for different classes of property is a clear violation of the applicable law.

## DID THE PLAINTIFFS HAVE AN ADEQUATE REMEDY AT LAW?

█ The appellants contend, as did the appellees in the Southern Pacific case, supra, and in McCluskey v. Sparks, 80 Ariz. 15, 291 P.2d 791 (1955), that the plaintiffs had an adequate remedy at law either under A.R.S. §§ 42–146 and 42–147 or under A.R.S. § 42–245. We believe this contention has been disposed of contrary to the appellants' position by the two above cited cases.

█ The appellants further contend that the plaintiffs had an adequate remedy at law under A.R.S. § 42–204, sub-sec. C reading as follows:

"C. After payment of the tax, an action may be maintained to recover any tax illegally collected, and if the tax due is determined to be less than the amount paid, the excess shall be refunded in the manner provided by this chapter."

While this particular contention does not appear to have been directly dealt with by the McCluskey and Southern Pacific cases, this Court is disinclined to believe that our Supreme Court, in holding that the plaintiffs in those cases had no adequate remedy

at law, was completely unaware of the above quoted section of our Code. That the Court was aware that there was an available statutory method of paying taxes under protest and suing to recover same when the illegality alleged is that of intentional and systematic discrimination is indicated by the closing paragraph in the Southern Pacific decision:

"The order of the trial court dismissing plaintiff's first claim for relief is affirmed. [Suit for refund of taxes paid under protest.] It is reversed as to appellant's second claim for relief. [Suit for injunctive relief.] If appellant establishes the facts alleged in its second claim, the court below is directed to enter an injunction compelling action in compliance with this decision and from and after the taxable year in which the superior court enters injunctive relief appellant *may pursue the statutory remedies for recovery of taxes occasioned by any further misapplication of the law to the assessment of its property.*" (Emphasis supplied.) (92 Ariz. 407, 377 P.2d 779)

The reasoning of Southern Pacific in denying the recovery of taxes paid under protest is that:

" * * * [T]he refund of taxes paid is by virtue of governmental grace rather than by reason of any legal right * * *." (92 Ariz. 406, 377 P.2d 778)

McCluskey held categorically that "the plaintiffs have no adequate remedy at law." (80 Ariz. 21, 291 P.2d 794) Whether the inadequacy of the remedy provided by A.R.S. § 42–204, subsec. C arises by reason of the uncertainties of recovery, or by virtue of the inadequacy deemed by our Supreme Court to be inherent in any requirement that a taxpayer pay taxes resulting from intentional discriminatory practices before he may be heard to complain of such practices, we need not decide. Suffice it to say, we believe that the trial court was authorized under the McCluskey and Southern Pacific decisions to grant injunctive relief.

The appellants attempt to distinguish these decisions on the basis that the plain-

tiffs in the McCluskey and Southern Pacific decisions had been singled out by the taxing authorities from all other owners of similar property, and that by granting injunctive relief in those cases basic equality would be achieved. Here, contrariwise, the appellants assert that the plaintiffs have been placed in a more favorable position than all of the remaining owners of improvements in Pima County who were not joined in this action. It is argued that plaintiffs should not profit at the expense of these other taxpayers simply because the plaintiffs have been in a position to bring suit while the many homeowners and other property owners in Pima County have not.

It is not clear from McCluskey whether all taxpayers similarly situated were joined in that action.[6] We believe, however, it is clear that not all of the taxpayers of the same class, if railroads are to be considered a separate "class", were joined in the Southern Pacific suit. Nor do we believe that our Supreme Court intended to limit the individual equitable relief deemed appropriate in the Southern Pacific case to taxpayers who might constitute all or substantially all of a "class" of property. We believe the decision was intended to be a bold stroke at a time-worn but distasteful avoidance of the clear mandate of statutory law by taxing officials. As such, it is in line with the recent trend of decisions of courts throughout this country in being more lenient in granting relief to the individual taxpayer.[7]

DOES A.R.S. § 42–204 PROHIBIT THE EQUITABLE RELIEF GRANTED BELOW?

■■ Appellants rely both on the original wording of A.R.S. § 42–204 and on the wording of this statute, effective as of

March 26, 1964, to invalidate the action taken below. (Quote of statute, supra, in Note 2.) As to the wording of this statute prior to the amendment of 1964, we believe the *Southern Pacific* case, again, to be controlling. On August 16, 1963, when this action was commenced and a temporary restraining order issued against extending on either the tax or assessment rolls the proposed valuation upon the plaintiffs' property, this statute only proscribed injunction to prevent "the collection of a tax imposed or levied." At this time, the Board of Supervisors had not as yet levied taxes for the year 1963 on the subject property. A.R.S. § 42–304 and § 42–309. In *Southern Pacific* it was pointed out that a suit to enjoin the extension onto the tax rolls of a proposed assessment " * * * does not seek to prohibit or enjoin the collection of a tax." (92 Ariz. 402, 377 P.2d 775)

■ Appellants next argue that the amendment, effective long after the commencement of this action, which prohibits the issuance of an injunction to prevent the extending upon the tax roll of any assessment, invalidates the action taken below. We cannot agree with this contention. It is well established that a statute will have prospective operation only unless it appears that it was intended to have retroactive effect. Gallo v. Industrial Commission, 83 Ariz. 392, 322 P.2d 372 (1958); Employment Security Commission v. Arizona Citrus Growers, 61 Ariz. 96, 144 P.2d 682 (1944). While statutory changes in procedure may be applied to proceedings already pending as to future steps in the litigation, a statute whose effect is to eliminate the pending action altogether is not applicable to a pending action. Berkovitz v. Arbib & Houlberg, 230 N.Y. 261, 130

6. The plaintiffs in McCluskey were: "H. S. and Helen B. McCluskey, together with a large number of other plaintiffs," who were "owners of property within these areas" [areas to be assessed on a new method]. (Quotes from 80 Ariz. 17, 291 P.2d 792)

7. See Note: "Inequality in Property Tax Assessments: New Cures for an Old

Ill", 75 Harvard Law Review 1374–1395 (1962). Note: "Inequalities in Tax Assessments—Multi-county School Districts Add New Emphasis To An Old Problem", 11 South Dakota Law Review 119–131 (1966); Wershaw, "Ad Valorem Assessments in Florida—Whither Now?" XVIII University of Florida Law Review 9 (1965).

N.E. 288 (1921) ; Duncan v. Corson County, 38 S.D. 623, 162 N.W. 395 (1917) ; Spokane and E. Trust Co. v. Spokane County, 173 Wash. 699, 22 P.2d 656 (1933) ; Bank of Fairfield v. Spokane County, 173 Wash. 145, 22 P.2d 646, 650 (1933).

Again, we have been cited no contrary authority. We hold that the amendment to A.R.S. § 42–204 does not render erroneous the granting of equitable relief in this action.

## ARE THE PLAINTIFFS ENTITLED TO BE TAXED ON IMPROVEMENTS AT THE SAME PERCENTAGE AS THAT APPLIED TO THE VALUE OF BARE LAND?

The appellants contended below and on appeal that there is "no magic" in the 12½ per cent figure arbitrarily selected by the assessor to be applied to the values established for bare land, and that if a 23 per cent figure is illegal, so is a figure of 12½ per cent. With this contention we agree.

The plaintiffs' right which is proposed to be violated by the defendants is to be taxed only to the extent of a fair share of the tax burden, uniformly and equally apportioned to the property valuations within the county. If the plaintiffs' taxes are to be reduced so that there be levied upon these improvements a tax of only 12½ per cent of their full cash value, then the court would be adding to properties which are not paying their fair share of the tax burden, to the detriment of all owners of property paying more than its fairly proportioned share. This follows from inescapable laws of apportionment. The Supreme Court of New Jersey, when faced with a similar problem, reasoned thus:

"Appellants claim their property was assessed for 1958 and 1960 above the 'common level' of assessments of other real property. In answers to interrogatories the city stated that 'residential' property was assessed in those years at a 'common level' of 40% of true value while 'commercial and industrial' prop-

erties were assessed at a 'common level' of 70%. Appellants' property is in the latter category. The Division of Tax Appeals ordered a reduction to 70% of true value. We certified the further appeals to the Appellate Division.

"Appellants' right to relief from the original assessments is not disputed. The sole issue is the measure of it. The city contends, and the Division of Tax Appeals agreed, that the reduction may not go below the level of assessment of other properties in the same class, whereas the taxpayers urge the assessment must be reduced to the level of the favored class, 'residential,' i. e., 40%. We are unable to agree with either view.

\* \* \* \* \* \*

"Hence, as to assessments made, the injured taxpayer is remitted to a different remedy, to wit, a reduction of his assessment to the 'common level' of assessments in the taxing district. The thesis is that the taxpayer is injured by so much of the tax bill as exceeds his *pro rata* share of the burden of local government. True, there may remain some residual harm in that the dollar value of the reduction may be recaptured in another year from all properties including that of the successful appellant. But perfect relief is inherently impossible. If the taxpayer pays no more than his fair share for the year in question, practical justice is achieved. Surely, if the taxpayer who appeals is permitted to pay less than his fair share, the injustice to those who were overassessed but did not complain would be compounded. Hence we held in Kents that an excessive assessment should be reduced to what it would have been if all taxable real property had been assessed equally. (Citations)

"None of the cases cited by the taxpayers supports the proposition that an excessive assessment should be reduced to the level of the most favored class when to do so would relieve the taxpayer of a part of his *pro rata* share of the total burden."

Siegal v. City of Newark, 38 N.J. 57, 183 A.2d 21–23 (1962).

We find the overwhelming weight of authority in this country, in those jurisdictions which allow any relief at all to the "undervalued" taxpayer, to be that the taxpayer is not entitled to be taxed at the lowest percentage that he can point to, but rather at what would be his share of the tax burden if the taxing authorities were faithfully adhering to the clear mandates of statute. Among the decisions taking substantially this position are: Bemis Bros. Bag Co. v. Claremont, 98 N.H. 446, 102 A.2d 512 (1954) ("at the same ratio to its true value as the assessed value of all other taxable estate bears to its true value"); People ex rel. Hillison v. Chicago, Burlington and Quincy Railroad Co., 22 Ill.2d 88, 174 N.E.2d 175 (1961) ("difference between its taxes for 1958 and the amount its taxes would have been had locally assessed property been equalized at full value"); People ex rel. Kohorst v. Gulf, Mobile and Ohio Railroad Co., 22 Ill.2d 104, 174 N.E.2d 182 (1961) ("that proportion of the total tax which the true value of his property bears to the true value of all other taxable property in the town"); Hodges v. Town of Kensington, 102 N.H. 399, 157 A.2d 649 (1960) ("its share of the common tax burden"); Ainsworth v. City of Claremont, 106 N.H. 85, 205 A.2d 356 (1964) (" * * * plaintiff had to prove that his tax was greater than it should have been with respect to the taxes of other property owners"); In re Appeals of Kents 2124 Atlantic Ave., Inc., 34 N.J. 21, 166 A.2d 763 (1961) ("average ratio"); City of Orange v. Levingston Shipbuilding Co., 258 F.2d 240 (5th Cir. 1958) ("proving that had the proper basis been applied to the actual market value of taxpayer's property, the assessed tax would have been less"); State v. Federal Land Bank of Houston, 160 Tex. 282, 329 S.W.2d 847 (1959) ("[T]he taxpayer must prove that his taxes are excessive or substantially higher by virtue of * * * the failure to assess taxable property at its market value.")

In support of their contention that they are entitled to be taxed at the lowest rate used by the assessor, the plaintiffs cite only the case of Shoppers' World, Inc. v. Board of Assessors, 348 Mass. 366, 203 N.E.2d 811 (1965). In Note 10 to this decision, appearing at 203 N.E.2d page 820, we find dictum that would support this proposition.[8] We do not find Shoppers' World to be in point for, as we read the case, it is dealing with a situation where all properties in the taxing district were intentionally assessed at 45 per cent of fair cash value. This was the lowest and *only* percentage being used by the assessing authorities and accordingly, if equitable relief were to be granted, there would be no substantial inequity in using this figure. The Bettigole case, 343 Mass. 223, 178 N.E.2d 10 (1961), cited in support of the statement made in Shoppers' World, is similarly not in point. The Bettigole action involved the sweeping relief of mandating taxing authorities to revise the entire taxing structure in the taxing district as to *all* properties therein so as to comport with the law. The relief granted in Bettigole would not knowingly grant to any taxpayer the right to be assessed at an amount less than a fairly apportioned share.

8. This note reads:
"If, as in the Bettigole case [Bettigole v. Assessors of Springfield], 343 Mass. 223, 227, 178 N.E.2d 10, it should be shown that several different percentages of full, fair cash value were employed in valuing different classes of property, the principle discussed in the Sioux City Bridge Co. case would logically require reduction of the assessment of a taxpayer against whom there had been discrimination *so that* such taxpayer's assessment would be proportional to the assessments of the class of property valued at the lowest percentage of fair cash value. It is not necessary for us now to consider whether patterns of illegal and discriminatory assessment may exist which are so complicated as to require the use of remedies which would treat the whole tax levy as invalid." (Emphasis added.)

The Harvard Law Review note, 75 Harvard Law Review 1374 et seq., suggests that the decision of Hamm v. State, 255 Minn. 64, 95 N.W.2d 649 (1959) allows the taxpayer to secure a reduction "from the average ratio to some lower level * * * presumably that of the under-assessed parcels to which he pointed in bringing his action." (75 Harvard Law Review, page 1385) We do not construe Hamm v. State to this effect. Though the reasoning of the case is abstruse, we believe the court held that the mere fact that the plaintiff's property was assessed at the "average percentage" used by the assessing authorities would not necessarily establish that the taxes imposed upon the plaintiff complied with the requirement of uniformity. We believe the court was indicating that a weighted average rather than an arithmetic average of percentages would be the proper method of arriving at the plaintiff's fair share of the tax burden.[9]

If these two lone decisions (Shoppers' World and Hamm) are authority for the proposition that a taxpayer is entitled to be assessed at the lowest percentage used, then we reject this view and adhere to what we consider to be the better view. We do not believe that in an action addressed to the equitable powers of the court, the plaintiff is entitled to injunctive relief requiring the taxing authorities to impose upon property less than what would be its share of the taxes if the law were faithfully observed.

 This phase of the case (Count I) went off on a motion for summary judgment. We believe there is a factual issue left to be resolved: In what amount, if any, were the plaintiffs injured by the unlawful practices of the defendants? Summary judgment having been wrongfully granted, this portion of the action must be returned to the trial court for further proceedings.

Lujan v. MacMurtrie, 94 Ariz. 273, 383 P.2d 187 (1963).

## MAY THE COUNTY ASSESSOR USE COST LESS DEPRECIATION AS AN ASSESSED VALUATION RATHER THAN "FULL CASH VALUE"?

The trial court found: " * * * The Assessor based his appraisal of full cash value strictly on the cost of construction of improvements, less 2 per cent per annum depreciation".[10]

 Though the appellants dispute that there was sufficient evidence in the record for the trial court to find that the defendants were using cost of construction less depreciation as the exclusive method of setting the value of improvements upon real estate, an examination of the record reveals substantially undisputed evidence to support such a finding. Even if disputed it would be the duty of this Court to resolve conflicts in the evidence favorably to the trial court's determination. Sulger v. Maslin, 90 Ariz. 70, 365 P.2d 1113 (1961).

 We pass on to the question of whether the practice of using cost less depreciation as the exclusive criterion of assessed valuation is a violation of our law. Our Code defines full cash value as follows:

A.R.S. § 42–201

"1. 'Full cash value' means the price at which property would sell if voluntarily offered for sale by the owner upon such terms as property is usually sold, and not the price which might be realized if the property were sold at forced sale."

Testimony at the hearing held below established that the plaintiffs' investment in the shopping center in question was not returning the revenue that had been anticipated and that if the property were placed on the

---

9. See In re Appeals of Kents 2124 Atlantic Ave., Inc., 166 A.2d 763 at page 769 for a discussion of "weighted average" vs. "unweighted average" as being different methods of arriving at the proper tax adjustment.

10. Quote is from page 2 of Memorandum Opinion of trial court dated September 29, 1964.

market for sale it would bring less than the depreciated cost of construction. Assessing authorities admitted that if anyone were so foolish as to build a hotel "in the middle of the Sahara Desert", such a hotel would be assessed the same amount as a hotel built in the center of downtown Tucson.

The provisions in our law creating strong political and economic reasons for deviation from the clear mandate of taxing statutes are not unique to this state.[11] The contention of the defendant assessor that he has the prerogative to select this one factor of cost less depreciation in arriving at cash value, like the other contentions of defendants, has been considered by the courts of other states on numerous occasions. The following cases hold that the ignoring of all factors affecting value other than cost of construction less depreciation or replacement cost less depreciation is a discrimination which may be corrected by legal proceedings when the method results in a substantial deviation from true value: May Stores Shopping Centers, Inc. v. Shoemaker, 151 Colo. 100, 376 P.2d 679 (1962); Alfred J. Sweet, Inc. v. City of Auburn, 134 Me. 28, 180 A. 803, 104 A.L.R. 784 (1935); Rowland v. City of Tyler, 5 S.W. 2d 756 (Tex.Com.App.1928); People ex rel. New York Cent. R. Co. v. Thompson, 156 Misc. 536, 282 N.Y.S. 269 (1935); Bellingham Community Hotel Co. v. Whatcom County, 190 Wash. 609, 70 P.2d 301 (1937); People ex rel. Colgate Inn v. Assessors of Town of Hamilton, 132 Misc. 506, 230 N.Y. S. 134 (1928); Buhl Foundation v. Board of Property Assessment, 407 Pa. 567, 180 A.2d 900 (1962); Mahoney v. City of San Diego, 198 Cal. 388, 245 P. 189 (1926); Tuckahoe Woman's Club v. City of Richmond, 199 Va. 734, 101 S.E.2d 571 (1958); First & Merchants Nat'l Bank of Richmond v. Amherst County, 204 Va. 584, 132 S.E.2d

721 (1963); Anderson's Red & White Store v. Kootenai County, 70 Idaho 260, 215 P.2d 815 (1950); In re Farmer's Appeal, 80 Idaho 72, 325 P.2d 278 (1958); City and County of Denver v. Lewin, 106 Colo. 331, 105 P.2d 854 (1940); De Luz Homes, Inc. v. County of San Diego, 45 Cal.2d 546, 290 P.2d 544 (1955); Essex Co. v. City of Lawrence, 214 Mass. 79, 100 N.E. 1016 (1913). Among the judicial pronouncements on this subject is the following from In re Farmer's Appeal, 325 P.2d 278 at page 280:

"Replacement cost at a particular time, less depreciation constitutes one criterion, but not the exclusive criterion, to be used in determining cash value.

"The method used to determine the value of the improvements on plaintiff's property, [replacement cost less depreciation] or other properties of like kind and character could produce a result which would reflect the actual cash value. Conversely, it might not. Such an exclusive method of fixing cash value could result in an erroneous or discriminatory value.

"We conclude that the criterion or method used in fixing cash value exclusively at replacement cost of improvements * * *, less depreciation, whether used by the State Tax Commission or the assessor, is erroneous, and not authorized by law. Other criteria of value, such as income, location, cost, actual cash sale value, or other pertinent factors should have been considered in determining assessed value." (325 P.2d 280)

Appellants have cited no contrary law. This being commercial property, it seems particularly appropriate that the income factor influencing value should at least be considered.[12] Accordingly, we are of the opinion that if the plaintiffs have shown that they were injured by the practice in question, they were entitled to some relief

11. See Tideman, "Fractional Assessments —Do Our Courts Sanction Inequality?", 16 Hastings Law Journal 573–589 (1965) for a discussion of various pressures tending to cause county assessors to assess at less than full cash value.

12. See Ancel, "Determining Fair Market Value of a Shopping Center for Purposes of Property Tax Assessment", 2 University of Illinois Law Forum 253–263 (1965).

in the trial court under the principles of the McCluskey and Southern Pacific cases.

We have previously indicated that the plaintiffs had failed to show injury by merely showing disparity between the 23 per cent and 12½ per cent figures used by the assessor. Like reasoning might lead us to the same conclusion insofar as the use of the arbitrary standard of cost less depreciation. If, for instance, this arbitrary method arrived at a value for all improvements in Pima County of 30 per cent or more above the full cash value thereof, then it could be argued that there would be no substantial detriment to the plaintiffs, for the tax imposed on plaintiffs' improvements might be equal to or less than their proportionate share of the tax burden. There is no direct proof in this record that such is not the case and hence it might be argued that the plaintiffs have failed to prove injury. A Texas court has reached this result. Pierce v. City of Jacksonville, 403 S.W.2d 512, 518 (Tex.Civ.App.1966).

However, we consider this Texas decision to be unduly restrictive of the taxpayers' remedies. We take judicial notice that costs of construction have generally been increasing rather than decreasing and that it is therefore probable that a method of using original cost less depreciation would usually result in a value less than current full cash value. The very presumption sometimes relied upon by taxing officials to the effect that they are presumed to have taxed property at full cash value until proven otherwise supports the inference that plaintiffs were injured to the extent they have shown their property to be valued at above its full cash value. People ex rel. Korzen v. Chicago, Burlington & Quincy Railroad Co., 32 Ill.2d 554, 209 N.E.2d 649 (1965). We hold that the plaintiffs made a sufficient showing of injury so as to be entitled to judicial relief under Count II.

## CAN A COURT IN AN EQUITABLE PROCEEDINGS DETERMINE THE FULL CASH VALUE OF PROPERTY FOR ASSESSMENT PURPOSES?

It is the appellants' contention that it is the scheme of our statutory law that

the discretion of making dollars and cents evaluations of property is vested in county assessors and certain statutory boards and that the courts have no authority to specifically fix the value of any particular piece of property. Appellants contend that the trial court at most can send a wrongful evaluation back to the appropriate taxing authorities for evaluation in accordance with law determined by the court.

We reject this contention as being overly litigious and defeating to the legitimate rights of wronged taxpayers. Our own Supreme Court, in an early decision, pointed in the direction of giving specific judicial relief to correct harmful discrimination in assessment practices:

"There should have been, in addition to the finding of fraudulent misconduct on the part of the board of equalization, a finding whether in fact the plaintiff's patented mines were overvalued, measured by the statutory rule of valuation; and the *decree should have enjoined the collection of only so much of the taxes assessed as were based upon any such overvaluation as may have been thus found.*" (Emphasis added) County of Cochise v. Copper Queen Consol. Min. Co., 8 Ariz. 221, at page 238, 71 P. 946, 951 (1903)

Most of the decisions hereinabove cited have held that judicial relief fixing the specific assessment or tax is merited when discriminatory practices are established. The appellants have cited no contrary authority.

The value of $700,000.00 was the lowest valuation placed upon the improvements in question with the exception of testimony of cost less depreciation. We hold that the trial court was justified in accepting this valuation as being the full cash value of the improvements for tax purposes for the year in question.

### DISPOSITION

Though this action has been presented in two counts, and properly so from the standpoint of legal theory, we are actually dealing with only one assessment and one tax bill. Though we have come to the conclusion that the trial court properly adjudicated the matters presented to it

under Count II of the complaint, it is not possible to affirm any specific final relief until there has been an adjudication as to the amount that this property should properly bear as its apportioned share of the ad valorem tax burden in Pima County. Until this is ascertained, the plaintiffs have not established that they have been injured or that they are entitled to any legal or equitable relief.

 Under the holding of this decision, the valuation of $700,000.00 as the full cash value of the improvements in question has been judicially established for the taxable year 1963. We agree with the trial court that payments made by the plaintiffs during the course of this action for taxes upon these improvements, after the temporary restraining order had been denied as to Count II, were paid under protest. 84 C.J. S. Taxation § 635, page 1280; 51 Am.Jur. Taxation, § 1185, page 1019. The final relief granted in this action should abide the determination by the court of what the tax on an assessment of $700,000.00 on these improvements would have been if all properties in the county had been evaluated at full cash value. If such a determination indicates that the plaintiffs have overpaid their taxes, the amount of the overage should be ordered refunded.

Reversed and remanded for further proceedings.

KRUCKER, C. J., and HATHAWAY, J., concurring.

## SUPPLEMENTAL OPINION ON MOTION FOR REHEARING.

MOLLOY, Judge.

The appellants have moved this court to reconsider its decision rendered in this case on August 17, 1966, advancing several grounds in support of their motion. All of these grounds have been previously advanced in the appellants' briefs and were disposed of in the opinion written, with two exceptions. These pertain to the contentions made that this court should take judicial notice of the purported fact that the shopping center which is the subject of this litigation was sold sometime after the trial below for more than the full cash value determined by the lower court and that this court should give only prospective application to its opinion.

Immediately prior to the issuance of our decision herein, the appellants had filed a petition to strike and dismiss Count II of the plaintiffs' complaint. This petition was denied by this court without an expression of its reasons for so doing. The grounds for this petition were the same as those now advanced on the motion for rehearing pertaining to the doctrine of judicial notice.

The motion for rehearing is accompanied with a copy of what purports to be a newspaper article in a local newspaper, dated June 17, 1966, which reports that there had been a sale of the Campbell Plaza Shopping Center for " * * * more than 1.2 million."

Appellants now state:

"This Court in this opinion has taken judicial notice of the fact that construction costs from the time of trial to the present time have steadily increased. The Court, therefore, can also take judicial notice of the sale as it appeared in the newspaper."

 Other than whatever authority there might be in this reference to this court's own opinion in this case, there is no authority whatsoever cited by the appellants which remotely suggests that a private sale such as reported in the June 17, 1966, newspaper article is a proper matter for judicial notice.

 We believe the following to be a proper statement of the law in this state as to matters of which judicial notice may be taken:

"In order for any tribunal, whether it be judicial or quasi judicial, to take judicial notice of any fact, it must be so notoriously true as not to be subject to reasonable dispute or must be capable of immediate accurate demonstration. (57 Harvard Law Review 273) A high degree of probability of the truth of a particular proposition cannot justify a tri-

bunal in taking judicial notice of its truth. (57 Harvard Law Review 274) A fact of which a court may take judicial notice must be indisputable. This being true it follows that evidence may not be received to dispute it." Phelps Dodge Corporation v. Ford, 68 Ariz. 190, 196, 203 P.2d 633, 638 (1949)

Under this doctrine, our Supreme Court has sanctioned the judicial noticing of such well-known economic facts as that wages are increasing, Whyte v. Industrial Commission, 71 Ariz. 338, 227 P.2d 230 (1951), that there was a general business depression commencing in 1929 and continuing to the time of the opinion released in Taylor v. Kingman Feldspar Co., 41 Ariz. 376, 18 P.2d 649 (1933), and that real property in close vicinity to the riverbed of the Salt River has marginal value for residential purposes, City of Scottsdale v. Municipal Court of Tempe, 90 Ariz. 393, 368 P.2d 637 (1962). Under these authorities, we believe it not inappropriate that this court in its opinion took judicial notice of the rising costs of improvements on real estate.

However, we note that in our opinion we did more than merely take note of rising costs of construction, in that we postulated that because of such rising costs, " * * * it is therefore probable that a method of using original cost less depreciation would usually result in a value less than current full cash value." Impliedly, we have by this statement assumed that a 2 per cent depreciation would be adequate to adjust for the decrease in full cash value of improvements resulting from obsolescence and other factors influencing depreciation. In this regard, we believe that we overstepped the permissible limits of judicial notice under the foregoing authority. The statement in regard to judicial notice is unnecessary for the opinion rendered, and accordingly we withdraw this statement pertaining to judicial notice from our opinion.

Under this doctrine of judicial notice, we believe that it would be completely improper for this court to take judicial notice of a private sale as reported in a newspaper article. Equally defeating to the appellants' claims in this regard, it must be remembered that we are an appellate, not a trial court. An event such as this, which purportedly occurred long after the trial of this action, even if of such general notoriety as to be the subject of judicial notice, should not be the predicate for the reversal of a decision reached on the basis of evidence presented to the trial court. 5 C.J.S. Appeal and Error, § 1487, p. 777 (1958); 5 Am.Jur.2d, Appeal and Error, § 728, pp. 171 et seq. (1962). To hold otherwise would be to cause well-advised litigants to appeal every decision of a trial court, regardless of how correct the decision rendered might be on the basis of the evidence then available, in the hope that while the appeal was in progress some event might occur which would prove that the decision rendered was incorrect.

The appellants ask further that the decision rendered be made prospective only and that adequate time be allowed to the defendant-assessor in which to make the "transition."

If we were modifying or overruling a previous judicial decision, or if we were ordering a complete revampment of the assessment rolls, a process that would require substantial time to accomplish, this request would have some merit. We are doing neither. We believe that the Supreme Court of our state made it crystal-clear in prior decisions of that court, particularly Southern Pacific Company v. Cochise County, 92 Ariz. 395, 377 P.2d 770 (1963), that the practice of arbitrarily assigning various percentages to the cash value of different classes of property in making assessments is a practice directly in violation of law. The *Southern Pacific* opinion was rendered in January of 1963. We do not believe that our opinion modifies or extends this decision as far as the use of percentages is concerned.

As far as the use of construction cost as the procrustean measurement of value, there have been no prior decisions in this

state, but the case law of the country, as we have pointed out in our opinion, appears to be unanimous that such a practice is illegal under statutes similar to ours. When the rights of a taxpayer are established by explicit statutory law, as in this case, we question our authority to deny or postpone relief, unless the financial stability of the taxing body is threatened with destruction as in the *Southern Pacific* case. We are not convinced that the granting of relief to the taxpayer in this case will substantially impair the financial integrity of either this county or this state.

The motion for rehearing is denied.

KRUCKER, C. J., and HATHAWAY, J., concurring.