790 P.2d 242

**FAIN LAND & CATTLE COMPANY,
an Arizona corporation, Petitioner,**

v.

**M.J. HASSELL, as State Land Commissioner; The Arizona State Land Department, an agency of The State of Arizona, Respondents.**

No. CV–89–0186–SA.

Supreme Court of Arizona,
En banc.

March 30, 1990.

Reconsideration Denied May 8, 1990.

Gammage & Burnham by Karen L. Schroeder and Cameron C. Artigue, Phoenix, for petitioner.

Robert K. Corbin, Atty. Gen., and Anthony B. Ching, Sol. Gen. by Theresa M. Craig and Charles S. Pierson, Phoenix, for respondents.

## OPINION

FELDMAN, Vice Chief Justice.

Fain Land & Cattle Company (Fain) brought this action against M.J. Hassell, State Land Commissioner (Commissioner), and the Arizona State Land Department (Department) seeking to require the Department to complete an exchange of state school trust lands for privately held lands pursuant to A.R.S. § 37–604 et seq. We must determine whether the transaction permitted by this statute violates the provisions of article 10 of the Arizona Constitution. See Rule 3, Ariz.R.P.Spec.Act., 17B A.R.S. We have jurisdiction under Ariz. Const. art. 6, § 5(1).

## FACTS AND PROCEDURAL HISTORY

On September 16, 1985, Fain applied under A.R.S. § 37–604 et seq. to exchange private land it owned for state school trust land. All the land in question is located in Yavapai County. On March 24, 1988, the Commissioner and three members of the State Selection Board approved the exchange of 874 acres owned by Fain for 635 acres of state school trust land. The basis upon which the exchange was approved was that it was "in the interest of the State for reasons of proper management, control, protection or public use of State land" and that "the selected State lands are substantially equal in value." Petition for Special Action (filed in Sup.Ct. May 31, 1989), at 2. On August 8, 1988, the Department informed Fain that it would not take any further action on the exchange, based on advice from the attorney general's office that this court's decision in *Deer Valley Unified School Dist. v. Superior Court*, 157 Ariz. 537, 760 P.2d 537 (1988), prohibited such exchanges.

On May 19, 1989, counsel for Fain sent a letter to the Commissioner demanding that the Department proceed with the exchange. After the Department refused to proceed on this demand, Fain filed this petition for special action,[1] requesting that this court hold that article 10 did not prohibit the exchange of state school trust lands. He also sought an order compelling the Commissioner to complete the exchange.

## DISCUSSION

A. Historical Setting: Interplay of the Arizona Enabling Act and Arizona Constitution

In 1910, Congress passed the Arizona–New Mexico Enabling Act, which authorized the residents of those territories to form state governments. Act of June 20, 1910, Pub.L. No. 219 (ch. 310), 36 Stat. 557 (hereafter Enabling Act). Sections 19 through 35 apply to Arizona. One provision of the Enabling Act granted Arizona certain federal land for the purpose of sup-

---

1. In Arizona, relief formerly obtained by extraordinary writs is now obtained by "special action." Rule 1, Arizona Rules of Procedure for Special Actions, 17B A.R.S.

porting public schools in the new state. Enabling Act § 24. Congress required Arizona to hold the granted land in trust, and only allowed disposal of the trust land subject to very specific and restrictive conditions. *See Kadish v. Arizona State Land Dep't,* 155 Ariz. 484, 487, 747 P.2d 1183, 1186 (1987), *aff'd,* — U.S. —, 109 S.Ct. 2037, 104 L.Ed.2d 696 (1989).

The state may only sell or lease trust land to the highest bidder at public auction after public notice. Enabling Act § 28. No sale or other disposal may be made unless the land is first appraised for its "true value," and the state receives consideration equal to, or greater than, the appraised value. *Id.* In addition, the Enabling Act provides that any disposition of trust land not in substantial conformity with its provisions is "null and void." *Id.* The rationale behind these strict requirements is that prior land grants to other states were improvidently managed, to put it mildly, and Congress wanted to ensure that the legislatures of Arizona and New Mexico would not dissipate the granted land.[2] *See Kadish,* 155 Ariz. at 486–88, 747 P.2d at 1185–87; *Murphy v. State,* 65 Ariz. 338, 350–53, 181 P.2d 336, 344–46 (1947) (recounting history of abuses that led Congress to insert the restrictions in the Arizona–New Mexico Enabling Act).

The Enabling Act required that the state and its people consent to all its provisions concerning lands granted to the state and that an ordinance be included in the state constitution "in such terms as shall positively preclude the making of any future constitutional amendment or any change or abrogation of the said ordinance in whole or in part without the consent of Congress." Enabling Act § 20. As a result, the framers inserted the following two clauses in the Arizona Constitution accepting the land grant and agreeing to the restrictions of the Enabling Act:

> The State of Arizona and its people hereby consent to all and singular the provisions of the Enabling Act ... concerning the lands thereby granted ... to the State, the terms and conditions upon which said grants and confirmations are made, and the means and manner of enforcing such terms and conditions, all in every respect and particular as in the aforesaid Enabling Act provided.
>
> This ordinance is hereby made a part of the Constitution of the State of Arizona, and no future Constitutional amendment shall be made which in any manner changes or abrogates this ordinance in whole or in part without the consent of Congress.

Ariz. Const. art. 20, Pars. 12 and 13.

In addition, the framers explicitly incorporated the restrictions of section 28 of the Enabling Act pertaining to disposal of trust lands into article 10 of the Arizona Constitution. However, article 10 is not merely a rescript of section 28. The framers added their own provisions for disposal of trust lands. For example, the constitution provides in part:

> All lands expressly transferred and confirmed to the State by the provisions of the Enabling Act approved June 20, 1910 ... shall be by the State accepted and held in trust *to be disposed of in whole or in part, only in manner as in the said Enabling Act and in this Constitution provided....*

Ariz. Const. art. 10, § 1 (emphasis added). This language effectively limits dispositions of state trust land to those authorized by *both* the Enabling Act *and* the state constitution.

On February 10, 1911, the people of Arizona ratified the proposed constitution, thus making the Enabling Act part of the organic law of this state. *See Deer Valley,* 157 Ariz. at 539, 760 P.2d at 539; *Kadish,* 155 Ariz. at 487, 747 P.2d at 1185; *Glad-*

---

**2.** Twenty-three states, including the original thirteen states, do not have enabling acts. Another twenty-three states have enabling acts that give full power and authority to the states' legislatures to determine the manner of trust land disposal. Because of frequent fraud and other abuse in the disposal of trust land that occurred in these states, Congress decided to impose stricter conditions for disposal of trust lands in the Arizona–New Mexico Enabling Act. *Murphy v. State,* 65 Ariz. 338, 350–51, 181 P.2d 336, 344 (1947).

*den Farms, Inc. v. State,* 129 Ariz. 516, 518, 633 P.2d 325, 327 (1981).

From time to time, Congress amended the Enabling Act to allow Arizona greater flexibility in the management and disposal of trust land. *Deer Valley,* 157 Ariz. at 539, 760 P.2d at 539. In 1934, Congress passed the Taylor Grazing Act, which allowed a state to exchange land located within a federal grazing district for other land. Act of June 28, 1934, ch. 865, 48 Stat. 1269 (codified at 43 U.S.C. §§ 315–316 (1934)). In 1936, Congress amended section 28 of the Enabling Act to permit extended leases and exchanges of school trust land. Act of June 5, 1936, ch. 517, 49 Stat. 1477. The exchange portion of the amendment provided:

> The State of Arizona *is authorized* to exchange any lands owned by it for other lands, public or private, under such regulations as the legislature thereof may prescribe. . . .

*Id.* (emphasis added). These amendments were intended to liberalize the restrictions on trust lands and allow the state greater freedom to manage the land granted by the Enabling Act. *See* H.R.Rep. 2615, 74th Cong., 2d Sess. 3 (1936).

In 1937, our state senate considered two concurrent resolutions that would have commenced procedures for amending article 10 of the Arizona Constitution to include the 1936 changes to the Enabling Act. SCR 11 and 12, 13th Legis.Reg.Sess. (1937). Both resolutions died on the calendar. Journal of the Senate, 13th Legis. Reg.Sess. 788 (1937). In 1940, Arizona amended article 10 to include the leasing provisions of the 1936 amendment to the Enabling Act, but did not incorporate the exchange provisions. Ariz. Const. art. 10, § 3 (amendment approved election Nov. 5, 1940, eff. Nov. 27, 1940). The 1936 Enabling Act amendment permitting exchanges has never been incorporated into the Arizona Constitution.

In 1948, without commencing the process for amending the constitution, the state legislature adopted the exchange terms of the Taylor Grazing Act and the broader 1936 exchange amendment. 1948 Ariz. Sess.Laws 633–34 (codified at A.R.S. § 11–1211 (1948)). The legislature ratified all prior land exchanges and passed a law that allowed the land department to exchange school trust land for federal land. *Id.* In 1971, the legislature enacted A.R.S. § 37–604 *et seq.,* which authorized exchanges of state land, including school trust lands, for private lands.[3] These statutes have no provision for notice and public auction. The exchange proposed in the present case is to be made, therefore, without public auction.

The attorney general formulates the following issue for our consideration: May the state enter into exchange transactions without complying with the public auction requirement of the Arizona Constitution when the transaction is permitted by state statutes passed under the authority of the Enabling Act?

### B. Impact of *Deer Valley* on Land Exchanges

#### 1. *Two Levels of Protection*

In *Deer Valley,* this court held that a school district could not condemn state trust lands for school purposes. *Deer Valley,* 157 Ariz. at 541, 760 P.2d at 541. The Deer Valley school district wanted to obtain a particular parcel of trust land on which to build a new elementary school. The Department refused to hold a public auction and allow the school district an opportunity to purchase the property. Deer Valley then attempted to condemn the proposed site under the eminent domain provisions of A.R.S. § 12–1111 *et seq.* The trial court dismissed the complaint on the grounds that the proposed condemnation violated both the Enabling Act and the Arizona Constitution. The appeal was transferred to this court to consider whether either the Enabling Act or the Arizona Constitution allowed a school district to condemn trust land. We held that the Ari-

---

**3.** A.R.S. § 37–604 *et seq.* apply to "state lands," not just school trust land. Our decision today affects this statutory scheme only so far as it applies to school trust lands granted to the state by the Enabling Act.

zona–New Mexico Enabling Act did not prevent acquisition of school trust property by condemnation, but the Arizona Constitution did.

We based our decision in *Deer Valley* on the premise that because Arizona included the restrictions on disposal of state trust land in its constitution, and because art. 10, § 1 requires that trust land be disposed of "only as provided in the Enabling Act *and* in the state constitution," there exist "two complementary levels of protection against improvident state legislative or executive disposal of Arizona's school trust land." 157 Ariz. at 539–40, 760 P.2d at 539–40. Both levels of protection must be satisfied for any disposal of state trust land to be valid. *Id.* We concluded that the Enabling Act provides a minimum level of protection for trust land, while our state constitution goes much further. *Id.* at 541, 760 P.2d at 541. The Arizona Constitution plainly requires that school trust land be disposed of only after public notice, auction, and sale to the highest and best bidder. Ariz. Const. art. 10, § 3. The Enabling Act may permit disposal by condemnation. *See Lassen v. Arizona ex rel. Arizona Highway Dep't,* 385 U.S. 458, 87 S.Ct. 584, 17 L.Ed.2d 515 (1967). Nonetheless, we concluded that the express provisions of article 10 prohibit methods of disposal not enumerated in *our* constitution. *Deer Valley,* 157 Ariz. at 541, 760 P.2d at 541. After *Deer Valley,* the Department suspended any further land exchanges pending clarification of the impact of the decision on exchanges.

### 2. *Is an Exchange a Sale?*

Emphasizing that condemnation is a forced sale without public auction, therefore violating both the Enabling Act and the Arizona Constitution, Fain contends that an exchange is not a sale. Because exchanges are explicitly authorized by the Enabling Act and not expressly prohibited by the Arizona Constitution, Fain argues that *Deer Valley* is not applicable to exchanges.

In *Deer Valley,* we said "[o]ur state charter plainly says that the state may not sell, lease or otherwise dispose of school trust land other than to the highest and best bidder at a duly advertised public auction." 157 Ariz. at 540, 760 P.2d at 540 (quoting Ariz. Const. art. 10, §§ 3–4). Fain accurately points out that the public auction provision of section 3 applies only to sales and leases, *not* all disposals, and only the appraisal provision of section 4 applies to all disposals. Thus, we must define an exchange and determine whether it differs from a sale. We also must determine whether the word "sale" in the Enabling Act and/or the Arizona Constitution encompasses an exchange.

A generally accepted definition of exchange is a "reciprocal transfer of property for other property of value, rather than for a money consideration." 30 AM.JUR.2d *Exchange of Property* § 1, at 363 (2d ed. 1967); *see also* 33 C.J.S. *Exchange of Property* § 1, at 4 (1942). Although a technical distinction exists between a sale and an exchange of property, the result is the same. Both transfer legal title from one party to another. In fact, the term "exchange" may be construed to be a form of sale. *See* 30 AM.JUR.2d *Exchange of Property* § 3, at 365–66.

Courts in other jurisdictions have distinguished exchanges from sales of real property. The key appears to be that an exchange occurs only if no value is assigned to either of the exchanged properties. *See, e.g., Gruver v. C.I.R.,* 142 F.2d 363, 366 (D.C.Cir.1944) (transaction is an exchange if the parties set no price for the property); *Ashton v. Ashton,* 89 Ariz. 148, 153, 359 P.2d 400, 403 (1961) (where the consideration for a transfer of property is expressed or valued in money terms the transaction is a sale); *Herring Motor Co. v. Aetna Trust & Sav. Co.,* 87 Ind.App. 83, 154 N.E. 29, 31 (1926) (transaction is an exchange where the parties transfer two properties without setting a price for either one); *Griswold v. Tucker,* 216 S.W.2d 276, 278 (Tex.Civ.App. 1948) (exchange occurs if one party passes property to another and receives property in return without any agreed upon value assigned to the property). The commonly accepted definition of "exchange" excludes transactions into which money enters, either as the consideration furnished by one

party *or* as a basis for measuring the value of the property transferred. *See, e.g., Trenton Cotton Oil Co. v. C.I.R.*, 147 F.2d 33, 36 (6th Cir.1945); *Badgett v. United States*, 175 F.Supp. 120, 126 (D.C.Ky.1959); *Gill v. Eagleton*, 108 Neb. 179, 187 N.W. 871, 872 (1922); *Hoovel v. State*, 125 Tex. Crim. 545, 69 S.W.2d 104, 108 (1934).

■ Thus, the test for determining whether a transaction constitutes a sale or an exchange is whether there is a fixed value at which the exchange is to be made—it is considered a sale if there is a fixed value and an exchange if there is not. *Hawn v. Malone*, 188 Iowa 439, 176 N.W. 393, 395 (1920). The rationale of these and other cases is succinctly and accurately summarized as follows:

> [W]here the parties exchange one property for another and the price or the value is not measured in terms of money, the transaction is an exchange, but if the property is disposed of for a valuable consideration with or without the payment of money and the bargain is made, and the value is measured, in terms of money, the transaction is a sale.

30 AM.JUR.2d *Exchange of Property* § 3, at 365.

■ Under the terms of the Enabling Act and our constitution, state trust land must be appraised prior to *any disposal.* This mandatory appraisal in effect sets a monetary value for the trust land to be conveyed. That "true value" must be obtained on disposal. Enabling Act § 28. Consequently, any disposition of trust land is based on realizing a preset dollar value and therefore results in a sale rather than an exchange.[4] We conclude, therefore, that an exchange of state trust land based on its appraised monetary value is a form of sale, even though the consideration is received in kind and not in cash. Given the restrictions the constitution places on all

disposals, any exchange would effectively constitute a sale.

■ The dissent argues that the transaction in question here was merely "a transfer of property for property" and not a sale because there was "no definite value" fixed on the state land, "money [was not] used as the basis of measure," and no "fixed price [was] required" by law. Dissent at 45, 47, 48–49, 51. The dissent overlooks the Enabling Act requirement that all trust "lands ... shall be appraised at their true value, and no sale or other disposal thereof shall be made for ... less than the value so ascertained." Enabling Act § 28, 1 A.R.S. at 109 (first full paragraph). Thus, before the state can dispose of trust land, it must ascertain a definite value by appraisal and obtain a consideration at least equal to that value. The same restrictions are in the Arizona Constitution in article 10, § 4. Contrary to the view of the dissent, therefore, the Enabling Act requires that a definite monetary value or price be fixed as the basis for the transfer.

## C. The Exchange Statutes and the Arizona Constitution

■ The Enabling Act, as amended, clearly permits Arizona to authorize exchanges of public trust lands. Having concluded that the exchange is a sale, we must now determine whether the Arizona Constitution prohibits the exchange procedure created by the Arizona statutes.

In 1971, the Arizona legislature enacted a statutory framework authorizing the Department to exchange all state land, including school trust land, for public or private land. A.R.S. § 37–604 *et seq.* This framework requires the Department to carefully consider any proposed exchange of trust land. Some of the requirements of this statutory scheme include a determination by the Department "that the proposed exchange would benefit the applicable trust";

---

**4.** The New Mexico Attorney General recently issued an opinion concluding that New Mexico could not exchange trust land. The Attorney General reasoned that, because the Arizona–New Mexico Enabling Act requires appraisal before any disposition of trust land, and appraisal sets a value on the land, the exchange

transaction results in a sale. Thus, "[b]ecause of the mandatory appraisal, it is not possible for the Commissioner to engage in 'exchanges' of trust land for other land." *See* N.M. Att'y Gen. Op. No. 88–35, at 4. New Mexico's Enabling Act has not been amended to allow exchanges. *Id.*

at least two independent appraisals that determine the value of the land offered for exchange to be substantially equal in value or worth more than the state land to be exchanged; notice in writing to other interested state agencies, counties, municipalities, and leaseholders on state lands that may be affected by the exchange; published notice of all proposed exchanges in the same manner required for sales of trust land; a public hearing on the exchange; dedication of the land conveyed to the state to the same purpose as the land exchanged; and provisions for protest, public hearing, and appeal of exchanges of trust land. *Id.*

Although this scheme provides many safeguards against improvident disposal of trust land, it does not provide all the protections of the original Enabling Act or article 10 of the Arizona Constitution. Most notably missing is the requirement of sale to the highest bidder at public auction. The purpose of this provision is to ensure that the trust receives the most benefit possible from sale or other use of the trust lands. *See* Comment, *Arizona's Enabling Act and the Transfer of State Lands for Public Purposes*, 8 ARIZ.L.REV. 133, 134 (1966). Without sale at public auction, the trust is not guaranteed the additional profit that might result from competitive bidding. *Deer Valley*, 157 Ariz. at 540, 760 P.2d at 540. It certainly is conceivable that someone might bid more than the appraised price at a public auction for a particularly desirable parcel, *see Gladden Farms*, 129 Ariz. at 520, 633 P.2d at 329, whereas with an exchange, the state is guaranteed only the appraised value of the property. We hold, therefore, that as applied to land held in the school trust, A.R.S. § 37–604 *et seq.* do not comply with article 10, § 3 of the Arizona Constitution. Because the constitution requires all sales to be at public auction, and because an exchange made for a preset appraised monetary value is a form of sale, no exchanges are permitted by the Arizona Constitution.

D. Does the Enabling Act Effectively Amend the Arizona Constitution?

 ▆▆  Fain argues that by consenting to the terms of the original Enabling Act,

Arizona in effect consented to any future amendments of the act. Fain correctly cites as a settled principle of statutory construction the rule that amendments to a statute should be construed as if they were part of the original act. *See* 1A N. SINGER, SUTHERLAND STATUTORY CONSTRUCTION § 22.35, at 296 (4th ed. 1985). However, this case does not involve a question of statutory construction. If the amended provisions of the Enabling Act were our only concern, we would conclude that A.R.S. § 37–604 *et seq.* could validly be applied to school trust land. We are also required, however, to read and apply the provisions of our state constitution, which unambiguously require sale at public auction. No constitutional authority exempts sales of trust land simply by calling them exchanges and allowing the state to accept payment in kind instead of cash.

Thus, we cannot agree with the dissent's view that exchanges are simply transfers of property for property and therefore exempt from the public auction requirements of the constitution. If this were so, the restrictions of the original Enabling Act would have been useless, for the state could have disposed of the trust lands simply by transfers in kind. Nor would such an interpretation comport with the understanding of Congress. If Congress had intended to exempt exchanges from the public auction requirements of the Enabling Act and the Arizona Constitution, there would have been no need for our legislature to petition Congress to amend the Enabling Act (*see post* n. 5), nor any need for Congress to pass the amendment, thereby authorizing Arizona to permit exchanges, if it so desired, by amending its constitution.

Nor do we believe that by consenting to the provisions of the Enabling Act, and presumably to its amendments, the people of Arizona intended to cede to Congress the power to amend the state constitution. Fain's suggestion that amendments to the Enabling Act should be construed as if they were part of the original act and therefore part of the Arizona Constitution would effectively grant Congress that pow-

er. Such a delegation would directly conflict with the provision that the *people* of the state reserve the power to propose amendments to the constitution and to enact or reject those amendments, independent of the legislature. Ariz. Const. art. 4, pt. 1, § 1(1). Surely, if the framers deprived the state's legislature of the power to amend the state's constitution, they cannot have intended to delegate it to Congress. Nor would such an intention have been consistent with our founders' concept of the federal-state relationship. Leshy, *The Making of the Arizona Constitution,* 20 ARIZ.ST.L.J. 1 (1988).

We are mindful that Congress, the settlor of the trust, has granted permission for the state, as trustee, to permit exchanges on such terms as the legislature determines are proper. We are mindful also that the legislature has enacted a statute that permits exchanges to be consummated only on many conditions designed to protect the public interest. So far as this record shows, the exchange proposed by Fain and agreed upon by the Department complies with the statute in all respects. It is tempting, of course, under such conditions, to approve the legislative scheme. However, constitutional principles and jurisprudential considerations prevent us from ignoring the plain, unambiguous text of our constitution.

The framers of our constitution were not required to insert the original provisions of the Enabling Act in the state constitution, but consciously chose to do so. When the people of Arizona voted on and accepted the constitution, with the provisions of the Enabling Act included, they obviously intended the words so adopted to become part of the organic law of this state. Indeed, the territorial delegates to Congress, Robert E. Morrison, Ralph H. Cameron, and J. Lorenzo Hubbell, all testified to the senate committee that the people of this state approved the original provisions of the Enabling Act in their entirety. *See* Report of Senator Beveridge, Chairman of the Committee on Territories (Senate Comm. on Territories, Report 454, 61st Congress, Second Session).

We conclude, therefore, that the amendments to the Enabling Act have not effected an amendment to the Arizona Constitution. The textual provisions of the Arizona Constitution prohibiting sale except by public auction are still in effect and must be applied, unless the amendments to the Enabling Act can be said to have preempted the contrary provisions of the Arizona Constitution.

### E. Preemption

■ Fain argues next that even if we interpret the Arizona Constitution to prohibit exchanges of school trust land, such restriction is preempted by the 1936 amendment to the Enabling Act. Fain correctly points out that state constitutions may be preempted by federal law. *See* U.S. Const. art. 6, cl. 2 ("This Constitution, and the Laws of the United States which shall be made in pursuance thereof ... shall be the supreme Law of the Land ... any Thing in the Constitution or Laws of any State to the Contrary notwithstanding."); *see also Developments in the Law—The Interpretation of State Constitutional Rights,* 95 HARV.L.REV. 1324, 1338 (1982). The supremacy clause mandates that federal law preempts state law where there is an actual conflict between the two. 1 R. ROTUNDA, J. NOWAK, J. YOUNG, TREATISE ON CONSTITUTIONAL LAW: SUBSTANCE AND PROCEDURE § 12.1, at 623 (1986).

We have previously acknowledged that the Enabling Act is superior to the Arizona Constitution. *See, e.g., Kadish,* 155 Ariz. at 486, 747 P.2d at 1185 ("Because federal law is supreme in this field, neither this court, nor the legislature, nor the people may alter or amend the trust provisions contained in the Enabling Act without congressional approval."); *Gladden Farms,* 129 Ariz. at 518, 633 P.2d at 327; *Murphy,* 65 Ariz. at 345, 181 P.2d at 340 ("The Arizona Constitution cannot be inconsistent with the Enabling Act."); *Boice v. Campbell,* 30 Ariz. 424, 428, 248 P. 34, 35 (1926).

However, in this case, no direct, actual conflict exists between the Enabling Act and the Arizona Constitution. By includ-

ing the restrictions on disposal of trust land in its constitution, Arizona does not require an act that federal law forbids. *See* R. ROTUNDA, *supra*, § 12.6, at 623. It merely provides additional protection to the trust lands, which it may legitimately do. *Id.*, § 1.6, at 31 ("[S]tate courts are always free to grant individuals more rights than those guaranteed by the Constitution, provided [they] do so on the basis of state law.").

Generally, without clear evidence of congressional intent, a federal law will not preempt state regulations. *Id.*, § 12.6, at 623. The exchange amendment and its legislative history do not suggest any intent on the part of Congress to preempt Arizona's constitution. By passing the 1936 amendment, Congress merely consented to removal of the restrictions against exchange of trust land, but did not require Arizona to amend its constitution or to pass legislation to allow exchanges.[5] The language of the amendment is permissive only. It states that Arizona "is authorized" to permit exchanges under such rules as the legislature may provide. Act of June 5, 1936, ch. 517, 49 Stat. 1477. Because the grant of power in the exchange amendment is permissive, no actual conflict exists between it and the Arizona Constitution.

Moreover, the provisions of article 10 do not "stand[ ] as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Pacific Gas & Elec. v. State Energy Resources Conservation & Dev. Comm'n*, 461 U.S. 190, 203–04, 103 S.Ct. 1713, 1722, 75 L.Ed.2d 752 (1983). The purpose of the Enabling Act restrictions on disposal of trust land is to ensure that the trust receives the most benefit possible from the trust lands. The purpose of the restric-

tions in article 10 of our constitution is the same—the restrictions do not frustrate the purposes of the Enabling Act.

The cardinal rule of constitutional construction is to follow the text and the intent of the framers, where it can be ascertained. *See, e.g., County of Apache v. Southwest Lumber Mills, Inc.*, 92 Ariz. 323, 327, 376 P.2d 854, 856 (1962) ("The governing principle of constitutional construction is to give effect to the intent and purpose of the framers of the constitutional provision and of the people who adopted it."). In the case before us, we are compelled to conclude that the provisions of the Arizona Constitution must be applied. The statutes, A.R.S. §§ 37–604 to 37–607, cannot be constitutionally applied to permit the sale—even if it be called an exchange—of school trust lands without compliance with the provisions of article 10 of the Arizona Constitution, including those provisions of section 3 that require that the state land be placed at public auction and sold to the highest bidder. In order for Arizona to legitimately permit exchanges of school trust land, it must amend the state constitution, as well as enact a statute setting forth the proper procedure.

For the foregoing reasons, we hold that the 1936 amendment to the Enabling Act does not preempt the provisions of article 10 of the Arizona Constitution.

### F. Validity of Past Exchanges—Constitutional Nullification

Although the validity of past exchanges is not directly before us at this time, Fain argues that a decision by this court that the legislature lacks the constitutional authority to permit exchanges of school trust land could have potentially grave ramifications regarding the status of past ex-

---

5. Nor would Congress have had any reason to require Arizona to permit exchanges. We can conceive of no federal program or objective that would be furthered by requiring the state of Arizona to permit exchanges. The amendment to the Enabling Act came pursuant to a request from the state of Arizona that it be permitted to effect exchanges. 1933 Ariz.Sess.Laws, H.J.M. No. 8. No national policy is furthered or even affected by the amendment to the Enabling Act;

that amendment applies only to the state of Arizona. *See* Act of June 5, 1936, ch. 517, 49 Stat. 1477. It does not even extend to our sister state, which also was covered by the Arizona–New Mexico Enabling Act. *See* N.M. Att'y Gen. Op. No. 88–35, at 4, n. 1. Certainly, if Congress had intended to require Arizona to permit exchanges it would have used appropriate language.

changes. Although ordinarily the retroactive effect of this decision could be left for determination in a future case, we believe it would be unwise for this court to cloud the title to thousands of acres of land conveyed and reconveyed in past exchanges. We must therefore decide the issue of retroactivity at this juncture.

Article 10, § 1 of our constitution permits disposition of school trust lands only in the manner provided by the Enabling Act *and* the Arizona Constitution. What is the result if trust land is disposed of in a way that does not violate provisions of the Enabling Act but does violate the Arizona Constitution? Section 28 of the Enabling Act provides:

> Every sale, lease, conveyance, or contract of or concerning any of the lands hereby granted or confirmed, ... not made in substantial conformity with the provisions of this Act shall be null and void, *any provisions of the constitution or laws of the said State to the contrary notwithstanding....*

(Emphasis added.) Article 10, § 8 of the Arizona Constitution contains an important difference; it provides:

> Every sale, lease, conveyance, or contract of or concerning any of the lands granted or confirmed ... *not made in substantial conformity with the provisions [of the Enabling Act], shall be null and void.*

(Emphasis added.)

These provisions of our constitution do not nullify all dispositions of trust land not made in strict compliance with article 10 of our constitution. *The only dispositions of trust land that are nullified are those that do not comply with the Enabling Act.* The Enabling Act as amended authorizes Arizona to pass legislation providing for exchanges of trust land. Arizona has done so. Therefore, exchanges completed pursuant to A.R.S. § 37–604 *et seq.* comply with the Enabling Act, and we are not required by the text of our constitution to nullify past exchanges. The validity of completed exchanges must turn on the question of the retroactivity of this opinion.

## G. Retroactive Versus Prospective Application of this Decision

Whether an opinion will be given prospective application only is a policy question within this court's discretion. *See Hawkins v. Allstate Ins. Co.*, 152 Ariz. 490, 505, 733 P.2d 1073, 1088, *cert. denied,* 484 U.S. 874, 108 S.Ct. 212, 98 L.Ed.2d 177 (1987). In Arizona, unless otherwise specified, an opinion in a civil case operates retroactively as well as prospectively. *See Law v. Superior Court,* 157 Ariz. 147, 160, 755 P.2d 1135, 1148 (1988); *Mark Lighting Fixture v. General Elec. Supply Co.,* 155 Ariz. 27, 30, 745 P.2d 85, 88 (1987); *Hawkins,* 152 Ariz. at 504, 733 P.2d at 1087; *Brannigan v. Raybuck,* 136 Ariz. 513, 520, 667 P.2d 213, 220 (1983); *Chevron Chem. Co. v. Superior Court,* 131 Ariz. 431, 435, 641 P.2d 1275, 1279 (1982). In *Chevron Chemical,* we approved a three-part test to determine whether this presumption of retroactivity has been overcome and a decision should be applied prospectively only. 131 Ariz. at 436, 641 P.2d at 1280. The factors to be considered are:

1. Whether the decision establishes a new legal principle by overruling clear and reliable precedent or by deciding an issue whose resolution was not foreshadowed;

2. Whether retroactive application will further or retard operation of the rule, considering the prior history, purpose, and effect of the rule;

3. Whether retroactive application will produce substantially inequitable results.

*Mark Lighting,* 155 Ariz. at 30, 745 P.2d at 88. These factors have been termed the reliance, purpose, and inequity factors. *Hawkins,* 152 Ariz. at 504, 733 P.2d at 1087.

The case law has not always been clear whether all factors must favor prospective application, or whether retroactive application is inappropriate if a single factor favors prospective application. *Mark Lighting,* 155 Ariz. at 31, 745 P.2d at 89; *Hawkins,* 152 Ariz. at 505, 733 P.2d at 1088. However, in *Law,* we settled the issue, reasoning that "[t]he decision of whether

an opinion will only be applied prospectively involves a balancing of these three factors," and concluding that our decision in that case should have prospective effect only, based on two of the three factors. 157 Ariz. at 161–62, 755 P.2d at 1149–50.

### 1. *The Reliance Factor*

In this case, we are deciding an issue whose resolution was certainly not foreshadowed. The state has engaged in land exchanges for many years under the assumption that valid statutory authorization existed. Although there have been other court cases dealing with exchanges of state trust lands, the issue of the constitutionality of such exchanges did not arise. It was not until our decision in *Deer Valley* that this assumption was called into question. Therefore, our decision in this case was not clearly foreshadowed by Arizona caselaw decided before *Deer Valley*, and this factor weighs against retroactive operation of our holding in this case.

### 2. *The Purpose Factor*

In this case, it is not entirely clear whether the balance on this factor weighs in favor of prospective application only. Essentially, our decision is based on the principle that the explicit terms of the Arizona Constitution must be followed. Applying this decision retroactively would not impair the purpose of the rule and might further its purpose by deterring violation. On the other hand, the statutory authorization for land exchanges, although passed without proper constitutional authority, contains significant restrictions on disposal, all of which are designed to fulfill the state's fiduciary responsibility. Retroactive application of this decision would not violate the trust because Congress has allowed exchanges. In this case, the purpose of the rule is not affected by its prospective or retroactive application, and the balance on this factor is neutral.

### 3. *The Inequity Factor*

This factor focuses on the injustice or hardship that would result from retroactive application of the new rule. *See Peagler v.*

*Phoenix Newspapers,* 114 Ariz. 309, 313, 560 P.2d 1216, 1220 (1977). Where a decision of this court could produce a substantially inequitable result if applied retroactively, we may avoid the injustice or hardship by applying the decision prospectively only. *See Law,* 157 Ariz. at 161, 755 P.2d at 1149. The balance of equities on this factor tips strongly in favor of prospective application only. Several hundred land exchanges have been completed over the years, affecting thousands of acres. If applied retroactively, this opinion might inflict great hardship on many innocent people, and perhaps disrupt the economy of the state. It would be impossible to undo all the land exchanges that have transpired and put everyone back in his original position.

Giving consideration to the above factors, we conclude that the balance weighs heavily in favor of limiting the effect of this decision to prospective application. Therefore, exchanges accomplished in compliance with the state's fiduciary obligations and with the 1936 exchange amendment to the Enabling Act and prior to the date of the opinion in *Deer Valley* are not void.

### CONCLUSION

The Arizona Constitution limits the disposal of state trust lands solely to the methods provided in the Enabling Act and the Arizona Constitution. As we stated in *Deer Valley*, the Enabling Act provides a minimum level of protection of state trust land. Arizona has provided a heightened level of protection by incorporating the restrictions on disposal of trust land directly into its constitution. No authorization for exchanges of trust land exists in the Arizona Constitution. The amendment to the Enabling Act that allows exchanges of school trust land was never incorporated into the Arizona Constitution. An exchange at a predetermined, approved dollar value is a sale. The Arizona Constitution requires that all sales be made at public auction. Therefore, no constitutional authority exists for the legislature to authorize exchanges. As a result, we find that

the statutory scheme regulating exchanges of state land found in A.R.S. §§ 37–604 to 37–607 is unconstitutional as applied to school trust land.

Because of the severe consequences that would result if this opinion were applied retroactively, we hold that this opinion shall be applied prospectively only, from the date on which *Deer Valley* was decided.

GORDON, C.J., and MOELLER, J., concur.

CORCORAN, Justice, concurring in part:

I agree with the majority's conclusion that "[n]o authorization for exchanges of state lands exists in the Arizona Constitution," and for that reason I concur in the holding that the exchange statutes are unconstitutional as applied to school trust lands. I do not, however, agree with the reasoning utilized by the majority to reach that result, and for that reason, I write separately.

### 1. *An Exchange is Not a "Sale" Authorized by the Constitution.*

I disagree with the majority's conclusion that because an exchange is based on an appraisal establishing a monetary value, it is a "sale" within the meaning of art. 10, § 3 that requires a public auction. Fain has pointed out similar situations in which courts have distinguished between exchanges and sales. *See, e.g., Watson v. Caldwell,* 160 Fla. 398, 35 So.2d 125 (1948). The semantic battle over the meaning of the word "sale," however, is not, in my opinion, dispositive of this issue.

The best indication that an exchange is not a "sale" in the constitutional context of article 10 is that exchanges were not al-

lowed as "sales" under the 1910 Enabling Act until it was amended in 1936 to include them. Implicit in that amendment is a recognition by Congress that the Enabling Act of 1910 did not allow exchanges. The Arizona Constitution, which contains substantially identical wording to the 1910 Enabling Act, and which has *not* been amended to conform to the 1936 amendment to the Enabling Act, therefore also does not allow exchanges. Further persuasive indication that the Arizona Constitution would have to be amended in order to explicitly authorize exchanges is found in the fact that both North Dakota and Montana have amended their constitutions to allow exchanges after being given federal authority to exchange trust lands.[6] Neither of those states chose simply to recognize exchanges as constitutionally authorized under the rubric of "sales," and neither requires public auctions for exchanges of state land.

Given this background, I do not believe that exchanges can logically be included in a constitutional definition of "sales." Because the constitution limits disposal of state lands to those methods provided in *both* the Enabling Act and the Constitution, if an exchange is not a "sale," and is not otherwise provided for in the constitution, the legislature had no constitutional authority to enact the statutory scheme providing for exchanges in A.R.S. §§ 37–604 through 37–607, as applied to school trust lands. No provision of article 10 of our constitution authorizes exchanges. Furthermore, art. 10, § 1 clearly requires that state trust land is to be disposed of only as provided in both the constitution and Enabling Act. Authorization for exchanges in the Enabling Act alone, without analogous authorization in the constitution as well, is simply inadequate. *See Deer Valley.* The legislature therefore was not empowered to

---

6. Four years before the 1936 Exchange Amendment, Congress authorized North Dakota, Montana, and Washington to exchange state trust lands. *See* Act of May 7, 1932, Pub.L. No. 124 (Ch. 172), 47 Stat. 150. North Dakota and Montana both subsequently amended their state constitutions to provide for exchanges. *See* N.D. Const. art. IX, § 6 ("Any of said lands and any other lands controlled by the board of university and school lands, including state coal mineral

interests, may, with the approval of said board, be exchanged for lands and coal mineral interests of the United States, the state of North Dakota, or any county or municipality thereof as the legislature may provide...."); Mont. Const. art. X, § 11 ("Any public land may be exchanged for any other land, public or private, which is equal in value, and, as closely as possible, equal in area.")

enact the challenged legislation. I believe this is the crux of the constitutional issue in this case.

### 2. *An Exchange is Not an "Other" Disposal or Disposition Authorized by the Constitution.*

Fain also argues, however, that even if exchanges are not included within the constitutional meaning of "sales," they are authorized by the constitutional language referring to "other disposal" or "any disposition" in various sections of article 10. This argument is again contradicted by the fact that the 1910 Enabling Act did not allow exchanges as either "sales" or as any "other" disposal or disposition, as evidenced by its subsequent amendment in 1936 to include them. · A more logical explanation of the meaning of these constitutional references to "other" disposals or dispositions is derived by examining the overall scheme of both the 1910 Enabling Act and the Arizona Constitution. For example, the Enabling Act referred to "the use thereof of the natural products" of the lands granted. Arizona Enabling Act, Ch. 310, § 28, 36 Stat. 557, 574 (1910). Disposition of "other products" is also mentioned in art. 10, § 3, which requires notice by publication for "any sale or contract for the sale of any timber or other natural product of such lands." Additionally, art. 10, § 4 refers to "timber, and other products of land" in its appraisal requirement. The legislature has provided for "disposition of products of state lands" by requiring that sale of "timber products, stone, gravel, and other products and property upon lands belonging to the state" must conform to *both* the Enabling Act and the constitution. *See* A.R.S. § 37–481. The Attorney General opined in 1979 that dispositions of these products, other than by sale of the land, were not subject to the public auction requirement of art. 10, § 3, but could not be disposed of for less than their appraised value. Op.Ariz.Att'y Gen. I79–166. Given this background, it appears that constitutional references to "other" disposals apply to disposals that involve less than a fee simple interest in the land. I therefore would not infer a constitutional authorization of exchanges, which result in a transfer of a fee simple interest, from the constitutional references to "other" disposals or dispositions.

I conclude that although the exchange statutes are authorized by the amendments to the Enabling Act, they are not constitutionally authorized. The legislature therefore had no authority to enact a statutory scheme providing for exchanges of state school trust lands; thus, those statutes are void.

### 3. *Effect of the Majority Decision.*

The majority notes that the attorney general has phrased the issue in this case as follows:

> May the state enter into exchange transactions without complying with the public auction requirement of the Arizona Constitution when the transaction is permitted by state statutes passed under the authority of the Enabling Act?

The majority relies in part on this court's decision in *Deer Valley* in answering this question in the negative. However, I would not so literally apply some of the broadly worded language of *Deer Valley* to the issues raised in this case. For example, *Deer Valley* holds that the constitution "plainly says that the state may not sell, lease, *or otherwise dispose* of school trust land other than to the highest and best bidder at a duly advertised public auction. Ariz. Const. art. 10, §§ 3–4." 157 Ariz. at 540, 760 P.2d at 540 (emphasis added). However, a "plain" reading of sections 3 and 4 of article 10 indicates that public auction is required only for the "sale or lease" of state trust lands, while an appraisal is required for "sale *or other disposition.*" To the extent that the *Deer Valley* decision conflates sections 3 and 4 into an unjustifiably broad requirement that public auction is required for *all* disposals of land, not just sale or lease, I do not believe it is supported by the plain language of article 10.

Under my analysis that an exchange is not a "sale," therefore, if an exchange were otherwise constitutionally authorized by amendment, it would not require a pub-

lic auction under the *present* wording of article 10. Under the majority's analysis, however, because an exchange is a "sale" that is already constitutionally authorized, all that would be necessary to remedy the constitutional infirmity of the present statutory scheme would be for the legislature to reenact the exchange statutes with the requirement that a public auction be held before an exchange could be made. Such a statutory enactment would render the exchange statutes in compliance with the requirement that "sales" be made only after public auction, and no constitutional amendment authorizing exchanges would be necessary. I contend that this leads to an absurd result: the requirement of holding a public auction for an exchange is impossible to implement.

When the state agrees to exchange land with a private party, it does so for a specific purpose relating to the unique nature of the land it wishes to acquire, not for the general purpose of obtaining the highest monetary equivalent for the land, as is the case with a sale. Thus, to require the state to forego a desirable exchange of state land for a specific private parcel with a unique benefit to the state because some other private party has offered an exchange of private land with a higher appraised monetary value would be to defeat the specific purpose of an exchange. It would force the state, in every instance, to first sell its own land at public auction, and then attempt to purchase, with the proceeds from that sale, the specific property it would have attempted to obtain by exchange. In a purchaser role, the state's bargaining position with the seller of the property that the state hopes to obtain may not always be as advantageous as if the state were able to exchange specific land in return. An exchange by public auction is an oxymoron, certainly not within the intentions of the framers of either the 1910 Enabling Act or our constitution.

This court has previously held that these provisions should be "reasonably construed, in view of the object of the grant, and the purpose of the restrictions." *State ex rel. Conway v. Land Department*, 62 Ariz. 248, 254, 156 P.2d 901, 903 (1945). I

would reasonably construe the constitution to conclude that an exchange is not a "sale," and is not otherwise constitutionally authorized. What is needed is a constitutional amendment authorizing exchanges, not a statutory requirement of public auction to validate the challenged legislation.

### 4. Effect of Statutory Provisions Regarding Sales.

I am also concerned about how the majority decision will affect the scope of other statutory provisions. If exchanges are constitutionally categorized as "sales," do the statutes applicable to "sales" now apply to exchanges? For example, "void sales" are statutorily provided for as follows:

> A sale made by mistake or not in accordance with law, or obtained by fraud, is void and the certificate of purchase issued thereon is void. The holder of the certificate shall surrender it to the state land department. The department shall, except in case of fraud, refund the money paid thereon to the holder of the certificate, and make compensation to the holder for the actual value of the improvements placed on the land by the purchaser. The value shall be determined by the department and paid from the general fund.

A.R.S. § 37–249. The majority's conclusion that today's decision applies only prospectively from the date of the mandate in *Deer Valley* does not suspend the operation of this statutory remedy for a void sale, because that issue is not even addressed in the context of this case, which involves an incomplete transaction. If an exchange is *not* a sale, however, the above statute voiding completed transactions would not apply to past exchanges, and this issue would not need to be resolved.

### 5. Retroactivity Analysis.

Fain points out that since 1971, when the legislature first enacted the statutory scheme allowing these exchanges, "30 such exchanges have been completed involving nearly 170,000 acres of land." Fain also correctly points out that "the validity of

these past exchanges is not directly before the Court." Other than brief references to past transactions, the parties in this case did not brief the issue of retroactive application of a holding that exchanges are unconstitutional. Additionally, the *Deer Valley* decision did not address the issue of its own retroactive application.

Neither this case nor *Deer Valley* presents a retroactivity issue, because neither case involved a completed exchange. In this case the court is not presented with the question whether to undo any previous exchange, because the Department did not approve Fain's application; thus, no exchange occurred. In *Deer Valley*, the superior court dismissed the school district's action to condemn a proposed school site; this court merely affirmed the trial court's dismissal of the action, and also did not need to address the voidness of a land transaction completed in reliance on an invalid statutory scheme.

Because the issue of the retroactivity of today's decision is not directly before this court, I would not address it until a case arose involving interested parties who could authoritatively argue the issue. Alternatively, if the majority *must* address the issue in the context of this case, I would have preferred ordering supplemental briefing from these parties on the specific issue of retroactivity. However, I will comment on the retroactivity issue because the majority has chosen to decide it.

I do not necessarily disagree with the majority's retroactivity analysis utilizing the 3–prong test from *Chevron Oil*, adopted by this court in *Chevron Chemical*, to conclude that, although the exchange statutes are unconstitutional, our decision today will be applied only prospectively. The majority's analysis that an exchange is a "sale" is clearly a new and novel constitutional interpretation that could hardly be foreshadowed by prior *case law*. The retroactivity cases cited by the majority, however, deal largely with common law principles that have been changed by judicial decision.

My concern is that such a retroactivity analysis does not appropriately apply to my conclusion that the statutory scheme is unconstitutional under the *clear language of the constitution*. My conclusion that an exchange is not a sale involves no new interpretation or overruling of prior precedent. A prospective application of a holding that a statute is unconstitutional on the basis of the clear wording of the constitution, in effect, results in this court's suspension of the constitutional limits on the disposal of state land from 1971 to 1988, when the *Deer Valley* case was decided.

However, I too believe that there is authority to reach the conclusion that today's decision should be applied prospectively, for several reasons. First, although the constitution provides that disposals made in violation of the Enabling Act shall be "null and void," it does not so provide for disposals that comply with the Enabling Act but violate the constitution. Thus, although we must void the legislation, we are not constitutionally compelled to void all transactions that occurred in reliance on that legislation.

Second, a prospective-only application based on reliance on an unconstitutional statute is supported by other cases in which great economic harm could occur to the state from a retroactive application. This court has recognized that, at common law, a declaration of unconstitutionality had complete retroactive effect; however, the rule that an unconstitutional statute was void from its inception and thus conferred no operative rights "has been considerably eroded with time, ... and is not the law in Arizona." *Shreve v. Western Coach Corp.*, 112 Ariz. 215, 217, 540 P.2d 687, 689 (1975) (refusing to follow the "Blackstonian view" set forth in *Norton v. Shelby County*, 118 U.S. 425, 442, 6 S.Ct. 1121, 1125, 30 L.Ed. 178 (1886)). This court has also recognized that citizens are entitled to rely on the validity of a statute until its repeal or a judicial declaration of its unconstitutionality. For example, we have held that an appellant who relied on a vetoed law before the veto was found unconstitutional could not be liable for monies that would have been due had the law been in effect, because "it would be the height

of injustice for the state to penalize ... one of its citizens for obeying a law which on its face was adopted in a constitutional manner, but which was, after such obedience by the citizen, held to be unconstitutional." *Texas Co. v. State,* 31 Ariz. 485, 502, 254 P. 1060, 1065 (1927). In a later case, this court relied on that reasoning to conclude:

> However desirable the total nullity doctrine of *Norton* may be from the standpoint of symmetrical jurisprudence it does not conform to reality. For a statute, until legislatively or judicially excised, is an operative fact which cannot be ignored. This court presumes every legislative act constitutional and indulges in every intendment in favor of its validity.... No penalties should be visited upon the citizenry for doing likewise.

*Austin v. Campbell,* 91 Ariz. 195, 203, 370 P.2d 769, 775 (1962).

Although these cases involved whether a citizen who relied on an unconstitutional law should be penalized by criminal or civil prosecution for that reliance, I believe the reasoning applies analogously to this situation, where participants in at least 30 land exchanges relied on the provisions of the exchange statutes that are presumed to be valid until this court holds otherwise. To subject those transactions to cloudy titles on the exchanged land or to require the participants to reverse the exchanges after a period of time would be to penalize everyone involved in transactions that were meant to benefit the state.

The retroactivity analysis used in several older cases involving the validity of taxing statutes or regulations can be applied to this situation, where the challenged statute is clearly defective and is not the result of a novel judicial interpretation. In one case, this court found that a taxing practice constituted a "willful, systematic and intentional violation of the law"; however, because the court also found that the remedy of refunding appellant's and similar claims "threatens the financial solvency of many taxing units of the state, particularly those in rural and undeveloped areas," the court concluded it could make its decision pro-

spective in application "where great hardship will result if caused from long continued failure to exert a legal right." *Southern Pacific Co. v. Cochise County,* 92 Ariz. 395, 406, 377 P.2d 770, 778 (1963). The court pointed out that appellant's "nonaction" in delaying to seek discontinuance of a settled practice "culminates in the present threat to the existence of government itself. The State's grace does not extend to its own destruction." *Id.* As a result of the "great economic hardship" to the state, the court refused to apply the decision retroactively.

In a later case, the court of appeals applied this analysis to its holding that a property valuation system of assessment was illegal and unconstitutional. *See Bade v. Drachman,* 4 Ariz.App. 55, 417 P.2d 689 (1966). The court declined to make the decision prospective only, reasoning as follows:

> If we were modifying or overruling a previous judicial decision, or if we were ordering a complete revampment of the assessment rolls, a process that would require substantial time to accomplish, this request [for prospective application] would have some merit. We are doing neither.... When the rights of a taxpayer are established by explicit statutory law, as in this case, *we question our authority to deny or postpone relief, unless the financial stability of the taxing body is threatened with destruction* as in the *Southern Pacific* case. We are not convinced that the granting of relief to the taxpayer in this case will substantially impair the financial integrity of either this county or this state.

*Bade,* 4 Ariz.App. at 69–70, 417 P.2d at 703–04 (emphasis added).

I would apply these standards to this case. However, without further briefing by adversely affected parties, I find it difficult to determine the exact extent of economic harm that would occur to the state or other parties by retroactive application of today's decision. But if we *must* decide the retroactivity issue here, I would concede that we could take notice of the significant adverse economic repercussions that

would result if the state were required to undo the exchanges and redo them as sales to the public with the requisite public auctions, assuming that anyone would, or procedurally could, bring an action to cause such chaos. Based on this potential great economic hardship, I would hold that today's decision applies only prospectively. Although I do not agree that the decision should run from the date the *Deer Valley* decision was mandated, that distinction makes no practical difference in light of the fact that the Land Department has suspended all exchanges since *Deer Valley* was decided.

### 6. *Other Issues.*

I agree with the majority that the 1936 amendments to the Enabling Act do not effectively amend the Arizona Constitution, and that the Enabling Act does not preempt the Arizona Constitution because it does not forbid anything that the constitution allows. I therefore concur in the result reached by the majority.

CAMERON, Justice, dissenting.

### I.

I dissent. I do not agree with the majority that an exchange of land is a sale simply because a value is assigned to one or all of the properties. I believe the plain meaning of the word "exchange" is the same as used in A.R.S. § 37–604 (Exchange Statute) and in the Enabling Act.

### II.

The majority states that "an exchange only occurs if no value is assigned to either of the exchanged properties." The majority cites nine cases in support of this statement. I do not believe these nine cases support the proposition that assigning a value to land transforms an exchange into a sale.

In *Gruver v. Commissioner of Internal Revenue*, 142 F.2d 363 (4th Cir.1944), a tax case, the Fourth Circuit Court of Appeals addressed the issue of whether a transaction is a sale or an exchange and stated:

> If no price is set for either property, it is said to be an exchange; but if each is valued and the difference is paid in money, it is a sale.

*Gruver*, 142 F.2d at 366.

The court in *Gruver* held that a sale of property requires not only a "fixed price," but also the difference paid in cash. *Id.* In *Fain*, there is no "fixed price" and no cash difference. Arizona law requires only that state lands to be exchanged must be of "substantially equal value or lesser value than the land offered by the applicant." A.R.S. § 37–604(C)(1). The appraisal of land does not mean that there is a "fixed price." The court in *Gruver* cites to *Corpus Juris Secundum* which states:

> However, technically speaking the words "exchange" and "sale" express logically different transactions. It has been stated broadly either specifically or substantially, that where there is a transfer of property for property other than money the transaction is an exchange, and that where the transfer is for money the transaction is a sale, and this is the meaning usually ascribed when a question of power or authority to sell is involved.

*Gruver*, 142 F.2d at 366 (citing 33 C.J.S., *Exchange of Property*, § 1 at 5 (1942)). The transaction in *Fain* is a "transfer of property for property," not a transfer for money. Therefore, the transaction is an exchange.

The majority next cites *Ashton v. Ashton*, 89 Ariz. 148, 359 P.2d 400 (1961), for the proposition that a transaction is a sale if price is mentioned in the transfer of property. *Ashton*, a divorce case, involved tax issues concerning the transfer of stock from one party to the other; it was not a real property matter. *Ashton*, 89 Ariz. at 154–55, 359 P.2d at 404. Apparently, the parties were concerned with assigning a dollar value to the property. The Arizona Supreme Court held that this was a tax-free exchange. Moreover, we note that definitions for the purpose of taxation can be deceiving when applied to transfers of real property because legislation in tax

matters is unique and reflects the legislative intent to raise revenue.

In *Ashton*, this court stated the general rule that a sale is "where the consideration for a transfer of property is expressed or valued in money terms and treated as a *specified* amount of money." *Ashton*, 89 Ariz. at 153, 359 P.2d at 403 (citing 33 C.J.S. Exchange of Property § 1 at 4) (emphasis added). The proposed Fain transaction is not a sale because an exchange of land in Arizona does not require a specified amount in consideration. *See* A.R.S. § 37–604. The lands to be exchanged are required only to be substantially equivalent to each other. *Id.*

In *Herring Motor Co. v. Aetna Trust & Savings Co.*, 87 Ind.App. 83, 154 N.E. 29 (1926), the seller delivered a group of shock absorbers on consignment. When the buyer was unable to dispose of the products, the buyer and seller entered into an agreement under which the seller agreed to take back the shock absorbers and give other merchandise in exchange as the buyer needed it. Upon receiving notice of shipment of the shock absorbers the seller said, "Just as soon as this shipment comes in we will send you a credit memorandum per our agreement, for which you are to take wheels or other products covering the entire amount." *Herring Motor*, 154 N.E. at 31. This was held to be a sale and not an exchange. I do not disagree with *Herring Motor*. However, the facts in *Herring Motor* are distinguishable from the facts in *Fain*.

The court in *Herring Motor* found that there was a "definite value fixed by the parties on the shock absorbers returned." *Id.* A "definite value," however, was not present in *Fain*. The State of Arizona, via the State Land Commissioner, stated only that the "offered private land and the selected state lands are substantially equal in value." *See* Decision and Order, Application to Exchange, 61–92301. As the court in *Herring Motor* noted:

> [W]here property is transferred for property, no price being set upon either piece, the transaction is an exchange, and the distinction has been recognized in the case of a transfer of personal property for other personal property, or of real property for other real property.

*Id.* (quoting 23 C.J. 185). Where no definite value or price is set, as in *Fain*, an exchange occurs.

In *Griswold v. Tucker*, 216 S.W.2d 276 (Tex.Ct.App.1948), a buyer traded his 1942 truck plus some cash for a 1947 model truck. The buyer believed he purchased a 1947 model when in fact he was sold a 1946 model worth less money. The buyer sued the seller for breach of warranty. The court held that the transaction was a sale stating:

> There is a recognized difference between an exchange and a sale. The test seems to be if one party passes his property to another and in turn receives from the latter his property without having an agreed value placed on both, it is deemed an exchange. Upon the other hand, a transaction is a sale although made for something other than money, where the property of each is transferred at an agreed or market value. This is likewise true if the property of one is transferred to another at an agreed price in part payment of the agreed total cash value of the other.

*Id.*, at 278. The transaction in *Griswold* involved two trucks with two definite market values and one specific cash amount. It therefore was a sale. In *Fain*, we deal with two parcels of land with an equivalent, but unnamed value. Again, no agreed upon dollar value was placed upon either Fain's land or the State's land.

The majority asserts that a transaction in which money is used as the "basis for measuring the value of the property transferred" is not an exchange. The majority then cites four cases that I believe actually contradict their contention that the proposed transaction in *Fain* is a sale. The majority first cites *Trenton Cotton Oil Co. v. Commissioner of Internal Revenue*, 147 F.2d 33 (6th Cir.1945), in which the court stated:

> "Exchange" is a word of precise import, meaning the giving of one thing for another, requiring the transfers to be in

kind, and excluding transactions into which money enters either as the consideration or as a basis of measure.

*Id.* at 36. Of course, the proposed land transaction in *Fain* does not involve using money as a basis of measure. The *Fain* transaction involved only a proposed transfer in kind of real property.

In *Badgett v. United States*, 175 F.Supp. 120 (D.C.Ky.1959), the court noted:

> The word "exchange" is to be given its ordinary meaning. It is a word of precise import meaning the giving of one thing for another, requiring the transfers to be in kind and excluding transactions into which money enters either as a consideration or as a basis of measure. (Citation omitted) An "exchange" is a reciprocal transfer of property as distinguished from the transfer of property for a money consideration only.

*Id.* at 126. The proposed transaction in *Fain* is such a "reciprocal transfer of property" as opposed to a sale.

In *Gill v. Eagleton*, 108 Neb. 179, 187 N.W. 871 (1922), the court considered a transfer of 68 acres of land valued at $5100 in exchange for a tractor plow outfit worth $1000, $1600 in cash and a $2500 note. The Nebraska Supreme Court held (correctly, I believe) that this transaction was a sale because the land was transferred at a fixed and agreed upon price for a set sum of money and a tractor outfit worth a set price. *Id.* 187 N.W. at 873. The court noted:

> At common law an exchange of land was a mutual grant of equal interests, not necessarily in value, but in dignity, as a fee for a fee, the one in consideration of the other, and differed from a sale in that *no fixed money price or value was placed on either of the properties exchanged.*

*Id.* at 872 (emphasis added). In *Fain*, we are dealing with a proposed mutual grant of *equivalent interests in land* with *no fixed price.*

In *Hoovel v. State*, 125 Tex.Crim. 545, 69 S.W.2d 104 (1934), the defendant was tried and convicted of property theft. His criminal acts consisted of an exchange under false pretenses of 100 shares of City Service Preferred Stock for 300 shares of City Service Common Stock. Although this case involved criminal law issues, the *Hoovel* court stated:

> The word "exchange" has a well-defined meaning and should be construed and given the usual and generally accepted meaning. " 'Exchange' means the giving of one thing for another. To constitute an exchange in the legal sense, the mutual transfers must be in kind, and any transaction into which money enters, either as the consideration furnished by one party or as a basis for measuring the value of the thing transferred, is excluded." (Citation omitted)

*Id.* 69 S.W.2d at 108. This, case cited by the majority, does little to support the contention of a sale in *Fain*. In *Fain*, the parties agreed to a "mutual transfer" of property in kind with no money involved which constitutes an exchange.

Finally, the majority cites *Hawn v. Mallone*, 188 Iowa 439, 176 N.W. 393 (1920), for the proposition that a transaction is a sale if there is a fixed value and that a sale occurred in *Fain* because Arizona requires a determination of the land's "true value" prior to disposition. Enabling Act, § 28. In *Hawn*, however, the court noted:

> The test for determining whether there has been a sale or exchange of property is whether there was a fixed price at which the exchange was to be made. If there was a fixed price, the transaction is a sale; if not, an exchange. (citation omitted)

*Hawn*, 176 N.W. at 395. In *Fain*, there was no fixed price for any of the land involved in the proposed transaction, nor was a fixed price required by either A.R.S. § 37–604 or the Arizona Constitution. As in the other eight cases cited by the majority, *Hawn* does not support the majority's contention that *Fain* involved a sale of land with the state.

### III.

At best, the majority can make the argument that the transaction in *Fain* is *like* a sale. This, however, ignores the specific

use of the word *exchange* in both the Enabling Act and A.R.S. § 37–604(A). We will use the plain meaning of a word in a statute unless it appears that a different or contrary meaning was intended. *State v. Wise,* 137 Ariz. 468, 671 P.2d 909 (1983); *McIntyre v. Mohave County,* 127 Ariz. 317, 620 P.2d 696 (1980). A sale and an exchange are two different concepts with different legal significance attached to each; otherwise, the words would be synonyms for each other with no legal difference.

The cases cited by the majority address various fact patterns, such as tax issues, personal property purchases and deals involving cash. Nowhere does the majority cite authority dealing with an exchange in kind of private land for public land. In fact, the majority ignores *Watson v. Caldwell,* 160 Fla. 398, 35 So.2d 125 (1948), cited by petitioner, which is exactly on point.

### IV.

In *Watson,* the Attorney General of the State of Florida sought to cancel two deeds. One deed from the State Board of Education (Board) conveyed school land to the Trustees of the Internal Improvement Fund (Trustees). The other deed conveyed swamp lands from the Trustees to the Board. The Attorney General argued that the Board and the Trustees did not comply with Florida law, which stated that no lands "shall be *sold, conveyed* or *disposed* of by the said trustees or by the said board of education" unless advertisement, notice and auction requirements were followed. *Id.* 35 So.2d at 126–27 (citing Fla.Stat.Ann. § 270.07) (emphasis added). The Florida Supreme Court held that the statute did not apply to exchanges and stated:

> This was not a "sale" but an exchange in kind to effectuate a definite legislative purpose which we shall now discuss more fully.

*Id.* at 127. The court further found that no laws required an *exchange* to be advertised. *Id.* (Emphasis added). The court added:

> An exchange in kind to aid the Park project is involved here. There is not the slightest suggestion that the land re-

ceived in exchange by the Board was not of equal value to the lands disposed of, so the school fund was not in the slightest depleted.

*Id.*

The facts in *Fain* are similar to the facts in *Watson.* Fain attempted to exchange land pursuant to an Arizona statute permitting such exchanges. *See* A.R.S. § 37–604. The State Land Department refused to complete the exchange arguing, in part, that the exchange does not comply with the requirement that state lands "shall not be *sold* or *leased,* in whole or in part, except to the highest bidder." Ariz. Const. art. 10 § 3 (emphasis added). I see no reason why the outcome in *Fain* should be any different than the outcome in *Watson.* An exchange of land is not the same as a sale or lease of land.

### V.

We also note that the majority ignores a North Carolina Court of Appeals case concerning an exchange of land which stated:

> Here, plaintiff originally and expressly sought to have the entire transaction— the "exchange"—declared void. Defendants resisted on the grounds that an exchange should not be subject to the statutory procedures governing sales by the Redevelopment Commission under N.C.G.S. 160–464 (now N.C.G.S. 160A–514). Until the action was remanded, none of the parties ever regarded the exchange as other than a single transaction or occurrence. To "exchange" has been defined as "[t]o part with, give, or transfer for an equivalent." Black's Law Dictionary 671 (4th ed. rev. 1968). In an exchange, specific property is given in consideration of property other than money, *although one of the parties may pay a sum of money in addition to the property.*

*Campbell v. First Baptist Church,* 51 N.C. App. 393, 276 S.E.2d 712, 714 (1981) (emphasis added).

### VI.

Because I believe this is an exchange and not a sale, we need only determine if our

constitution prohibits an exchange. It appears that there are no prohibitions. The Enabling Act specifically allows exchanges. *See* Enabling Act § 28. Article 10, § 3 of the Arizona Constitution specifically allows exchanges between the state and federal government. In addition:

> No lands shall be sold for less than three dollars per acre, and no lands which are or shall be susceptible of irrigation under any projects now or hereafter completed or adopted by the United States under legislation for the reclamation of lands, or under any other project for the reclamation of lands, shall be sold at less than twenty-five dollars per acre; Provided, that the State, at the request of the Secretary of the Interior, shall from time to time relinquish such of its lands to the United States as at any time are needed for irrigation works in connection with any such Government project, and other lands in lieu thereof shall be selected from lands of the character named and in the manner prescribed in Section Twenty–Four of the said Enabling Act.

A.R.S. Const. art. 10, § 5.

I find nothing in our constitution which prohibits the legislature from providing a method whereby exchanges may take place. Article 10, § 3 restricts only the *sale* or *lease* of lands, not the *exchange* of land. The exchange statute (A.R.S. § 37–604), on the other hand, requires permission from the State Land Department and notice to other entities and provides for the protection of the trust lands in the same manner as in other states by requiring an appraisal before the exchange may take place.

### VII.

There is a presumption that statutes are constitutional unless shown to be otherwise. We will not declare an act of the legislature unconstitutional unless we are satisfied beyond a reasonable doubt that the act conflicts with the federal or state constitutions. *Chevron Chemical Co. v. Superior Court,* 131 Ariz. 431, 641 P.2d 1275 (1982). In looking at the common and ordinary definition of the word exchange, we note that Congress believed an exchange of land was not a sale. It is, therefore, arguable that the Congress of the United States amended the Enabling Act to specifically provide for an exchange under the safeguards provided by the legislature.

I find no state, federal, or constitutional provision providing that an exchange of state land is a sale. Alaska, for example, provides for exchange of state lands after determination of fair market value. Alaska Stat. § 38.50.020 (Value of Properties Exchanged). *See also* Cal. [Pub. Res.] Code § 7303. (Exchange of lands in place reserved from sales); Nev.Rev.Stat. § 323.010 et seq. (Authority of state land registrar to exchange state lands for lands of equal value); Haw.Rev.Stat. § 171–50 (Exchanges).

### VIII.

The majority makes several other arguments with which I cannot agree. One argument is that, pursuant to *Deer Valley Unified School Dist. v. Superior Court,* 157 Ariz. 537, 760 P.2d 537 (1988), the Arizona Constitution requires that school trust land may be disposed of only after public notice and public auction.

Our constitution does prohibit certain methods of disposal, sale or lease. *See Deer Valley,* 157 Ariz. at 541, 760 P.2d 537; Ariz. Const. art. 10 §§ 1–4. This does not necessarily mean that an exchange of land is prohibited. Indeed, if our constitution prohibits exchanges, there is no reason for the majority to spend so much time and effort trying to prove that an exchange is a sale.

### IX.

The majority also contends that the Exchange Statute (A.R.S. § 37–604) does not afford as much protection to state lands as does Article 10. The majority argues that the purpose of Article 10 is to "ensure that the trust receives the most benefit possible from sale or other use of the trust lands" and that this benefit is assured through the public auction requirement.

I believe the Exchange Statute provides ample protection to benefit the trust lands. There are, on the other hand, some drawbacks to the public auction requirement. For example, parties in the private sector have more flexibility in financing and can raise capital in ways unavailable to the public sector. A private party would be able, therefore, to outbid a public agency at a public auction. *See* Comment, *Arizona's Enabling Act and the Transfer of State Lands for Public Purposes*, 8 Ariz.L.Rev. 133, 135–36 (1966).

The majority also speculates that it "is conceivable that someone might bid more than the appraised price at a public auction." Even if the state's goal is to profit as much as possible, nothing prevents the State from realizing such benefits or profits through exchanges of state lands. The exchange statute makes clear that an applicant's land must be at least of "substantially equal value," if not more, to the value of the state land. A.R.S. § 37–604(C)(1). The State Land Department has the power to determine if the proposed exchange would actually benefit the trust land. A.R.S. § 37–604(B)(3). The exchange statute provides for public notice and provides that any person may protest the proposed exchange. A.R.S. § 37–604(C)(7).

The majority argues "there is no constitutional authority to exempt sales of trust land simply by calling them exchanges and allowing the state to accept payment in kind instead of cash." I believe the majority misses the point. Certain legal consequences attach to an exchange (tax consequences, for example) and payment in kind *is* different than payment in cash. To hold otherwise would strip away any legal significance of the term "exchange" and we may as well label *all* transactions "sales" or "disposals."

### X.

I would allow the proposed exchange under our constitution.